# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>PAUL KINNEY and )<br>RONALD KINNEY, JR., )<br>Defendants. ) | Case No. 4:05CR280ERW(MLM) |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter is before the court on the pretrial Motions of the parties. On July 18, 2005 an Evidentiary Hearing was held. Both defendants were present and represented by counsel, Lucille G. Liggett for defendant Paul Kinney and J. Christian Goeke for defendant Ronald Kinney, Jr. The government was represented by Assistant United States Attorney James C. Delworth.

At the hearing the government presented the testimony of Michael Burke, a Special Agent with the State of California Department of Justice and Mark Rigel, a Lieutenant Detective with the Park Hills, Missouri, Police Department, presently detached to DEA as a Task Force Officer. The defendants did not present evidence. Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witnesses, the undersigned makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

On June 1, 2005 Special Agent (SA) Burke presented a Search Warrant and Affidavit to a Superior Court Judge in California. Gov.Ex.1. The Search Warrant describes in great detail in Attachment A the single story commercial building to be searched.[1] It specifies the objects of the search in Attachment B, four and one half pages in length. It lists SA Burke's training and expertise

---

[1] The Search Warrant actually covers two locations. Location #1, 3860 East Coronado Street, Unit J, in the City of Anaheim, Orange County, California is the one pertinent to the defendants in this case. The other location is not relevant to this case.

in a separate one and one half page section which includes the various training courses he has attended and his extensive experience in the investigation of clandestine methamphetamine manufacturing laboratories, preparation and execution of search warrants and knowledge of and experience with numerous other narcotic drugs. The statement of probable cause is in two parts pursuant to California procedure. One part is the non-sensitive information and is part of Gov.Ex.1. The other part, the "confidential attachment" contains information about the Confidential Informant (CI). It states that if this information were made public it could reveal or tend to reveal the identification of the CI, impair the investigation and endanger the life of the CI. Gov.Ex.2. This portion of the statement of probable cause was ordered sealed by the judge and was not unsealed until July 11, 2005 on the request of the United States Attorney and by order of the California Superior Court Judge. See Gov.Ex.1, p.13 and Gov.Ex.2, p.6. Both the non-sensitive part and the confidential part of the Affidavit are incorporated by reference as if fully set out herein.

SA Burke's Affidavit states that on 12/1/04 Detective Judy Williams of PROACT in California spoke to DEA Task Force Officer (TFO) Gerald Williams of the St. Louis office. TFO Williams told Det. Williams that he was currently investigating defendant Paul Kinney and defendant Ronald Kinney, Jr. Det. Williams was able to determine that 3860 East Coronado, Unit J (the location of the instant search) was a business where the defendants were working.

Previously in 2000 detectives from PROACT had served a search warrant at 3860 East Coronado, on both Units J and G. Chemicals and apparatus associated with methamphetamine manufacturing were found in Unit G. Several suspects including Ruben Cardenas were arrested. During surveillance defendant Paul Kinney was seen going back and forth between Unit J and Unit G and meeting with several suspects who were later arrested. Defendant Paul Kinney was also arrested based on his actions, based on statements by other arrestees and based on a small amount of methamphetamine found in Unit J. Defendant Ronald Kinney, Jr. was also present in Unit J but was not arrested.

In 2002 Ruben Cardenas was arrested and charged for being in another methamphetamine laboratory. He later pled guilty to a lesser charge.

TFO Williams told SA Burke that on 11/24/04, DEA intercepted a parcel going to an individual in Missouri. A state search warrant was secured for the parcel and two pounds of methamphetamine were found. The individual was identified and agreed to work as a CI for DEA. At the time of the presentation of the Affidavit, the CI had current pending charges but had been given no promises of leniency. The CI was told that a letter requesting consideration was possible depending on the information provided. The CI told TFO Williams that the person who sent the package to her was defendant Paul Kinney who lived on Coronado Street in Anaheim, California. The CI told TFO Williams that he/she could order methamphetamine from defendant Paul Kinney and/or defendant Ronald Kinney, Jr. and have it shipped to Missouri. The CI also said that he/she still owed money for the two pounds of methamphetamine that had been seized.

TFO Williams told SA Burke that in April, 2005 the CI had several recorded conversations with defendant Ronald Kinney, Jr. at the direction of DEA and had ordered another pound of methamphetamine. On 4/29/05 DEA intercepted a parcel addressed to the CI which was found to contain one pound of methamphetamine. In a recorded conversation defendant Ronald Kinney, Jr. admitted sending the methamphetamine.

On 5/4/05 TFO Williams stated that DEA-Missouri would be using the same CI to pay for methamphetamine previously sent by defendant Ronald Kinney, Jr. The CI wired $3,100 in DEA funds to defendant Ronald Kinney, Jr. as partial payment for methamphetamine seized on 4/29/05. PROACT personnel set up surveillance at Unit J. Defendant Ronald Kinney, Jr. was followed by the surveillance team from Unit J to a Western Union outlet and back to Unit J. It was verified that the wired money had been picked up.

This same payment plan using the CI to send money to defendants Paul Kinney and Ronald Kinney, Jr. was used on 5/12/05. The CI called defendant Ronald Kinney, Jr. and told him the money had been sent and gave him tracking numbers. They also discussed the future purchase of

three pounds of methamphetamine to be shipped at a later date. Once again, PROACT personnel surveilled defendants Paul Kinney and Ronald Kinney, Jr. leaving Unit J and going to the Western Union outlet and back to Unit J. Again they verified that the wired money had been picked up.

During a recorded conversation on 5/12/05 defendant Ronald Kinney, Jr. told the CI that he needed to check with "his guy Ruben" about more money owed for the two pounds of methamphetamine that were intercepted on 11/24/04. Defendant Ronald Kinney, Jr. told the CI that he usually pays Ruben as soon as he gets money wired by the CI. On 5/16/05 PROACT detectives set up surveillance at 3860 East Coronado Street. They saw a green Ford Ranger pickup driven by Ruben Cardenas arrive and observed defendant Ronald Kinney, Jr. meet with Cardenas in the parking lot.

On 5/31/05 SA Burke was advised by TFO Williams that DEA-Missouri would be using the same CI to pay for methamphetamine sent by defendant Paul Kinney. The CI would wire $2,500 in DEA funds as partial payment for methamphetamine sent to Missouri by defendant Paul Kinney and seized on 11/24/04. The CI called defendant Ronald Kinney, Jr. and told him the money had been sent and gave him the tracking number. Again PROACT personnel surveilled Unit J and observed defendant Ronald Kinney, Jr. go from Unit J to a Western Union outlet and back to Unit J. Approximately 30 minutes later Ruben Cardenas arrived in the same Ford Ranger. Defendant Ronald Kinney, Jr. and Cardenas had another conversation in the parking lot. The officers were able to verify that the wired money had been picked up. The Affidavit concludes that DEA-Missouri had secured Federal indictments against Ronald Kinney, Jr. and Paul Kinney based on their investigation which included recorded phone calls between them and the CI, their actions observed by PROACT in California and the seizures of methamphetamine made by the DEA in Missouri.

Following this information in the Affidavit, SA Burke set out in three and one half pages details of his knowledge and beliefs about methamphetamine traffickers and indicated he believed there was probable cause to search the premises at 3860 East Coronado, Unit J as well as "all structures, sheds, storage buildings, or areas associated with, or leased to Unit J." He also requested

permission to search "all vehicles that are located on the property or that are associated with Unit J in any way." The Superior Court Judge found that, based on all of the information submitted, there was probable cause for the search and signed the Search Warrant.

The Warrant was executed the same day, June 1, 2005. Unit J has a glass pedestrian door as well as a metal, rolling, garage-type door which can accommodate a vehicle. The executing officers approached the glass door and knocked. They saw defendant Paul Kinney looking out and told him to open the door, which he did. They searched the premises as well as the motor home vehicle inside it. Both defendant Paul Kinney and defendant Ronald Kinney, Jr. were arrested by DEA on the Arrest Warrant issued pursuant to the Indictment in this case. The items seized are listed on the Return to Search Warrant. Gov.Ex.3.[2]

TFO Rigel testified that he used a CI to make taped phone calls to the defendants, primarily to defendant Ronald Kinney, Jr. TFO Rigel approached the CI while she was walking, told her she had committed a crime[3] and she agreed to cooperate. TFO Rigel gave her a ride to the police station. No threats or promises of leniency were made to induce her cooperation. TFO Rigel told her he would make her cooperation known to the U. S. Attorney's Office. The calls were made from pay phones in Park Hills, Missouri using a calling card purchased by TFO Rigel.

Gov.Ex.4 lists 15 calls made from 4/11/05 - 5/20/05. TFO Rigel was present for all these calls. The CI voluntarily consented to making all of the calls. Although the calls were made primarily to defendant Ronald Kinney, Jr., on some occasions defendant Paul Kinney can be heard

---

[2] The first seven items listed are the ones seized from 3860 East Coronado, Unit J. They are: (1) two glass pipes with burnt bulbous ends; (2) three Western Union receipts to Ronald Kinney for $2,350; (3) miscellaneous paper work from Anaheim Utilities; (4) miscellaneous paper work for Paul Kinney; (5) letter addressed to Paul Vega; (6) one Compaq Presario computer; and (7) miscellaneous paper work for Ronald Kinney. These items are being maintained in the evidence vault in California. No independent search of the computer has been made.

[3] From a Title III wiretap, TFO Rigel knew the CI was a multi-kilo dealer of methamphetamine in Park Hills, Missouri and had frequently sold a pound of methamphetamine at a time to various wholesale dealers.

answering the phone and then handing the phone to defendant Ronald Kinney, Jr. Sometimes defendant Paul Kinney can be heard talking in the background.[4] The CI made another call on 5/31/05 while TFO Rigel was in California. Another law enforcement officer was present with the CI during this call and again the CI voluntarily consented to making the call. After all these calls were made, the CI expressed fear for her safety and said she wanted to move. She was given $1,000 for moving expenses.

## CONCLUSIONS OF LAW

**1.    Search Warrant**

Search warrants to be valid must be based on a finding by a neutral detached judicial officer that there is probable cause to believe that evidence, instrumentalities or fruits of a crime, contraband or a person for whose arrest there is probable cause may be found in the place to be searched. Johnson v. United States, 333 U.S. 10 (1948); Warden v. Hayden, 387 U.S. 294 (1967); Fed.R.Crim.P. 41. The standard of probable cause for the issuing judge is whether, given the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). Probable cause is "a fluid concept--turning on the assessment of probabilities in particular factual contexts--not readily, or even usefully, reduced to a neat set of legal rules." Gates, 462 U.S. at 232. Applications and affidavits should be read with common sense and not in a grudging, hypertechnical fashion. United States v. Ventresca, 380 U.S. 102, 109 (1965). Information contained in applications and affidavits for search warrants must be examined in the totality of the circumstances presented. Gates, 462 U.S. at 230. The duty of the reviewing judge "is simply to ensure that the [issuing judge] had a `substantial basis for . . . conclud[ing]' that probable cause existed." Gates, 462 U.S. at 238-39, quoting Jones v. United States, 362 U.S. 257, 271 (1960). Once a judicial officer has issued a warrant upon a finding of probable cause, that finding deserves great deference. Gates, 462 U.S. at

---

[4]    TFO Rigel was familiar with defendant Paul Kinney's voice from having heard it previously on a Title III wiretap.

236. The affidavit presented in the instant case clearly contains the "fair probability" that evidence, instrumentalities or fruits of a crime or contraband would be found at 3860 East Coronado Street, Unit J. The facts set out above show that there was a substantial basis for concluding that probable cause existed.

The probable cause was based on information, including surveillance and the execution of a search warrant going back as far as the year 2000, that defendants were involved in manufacturing methamphetamine. Ruben Cardenas, a convicted methamphetamine dealer, was connected to defendants at the same address on Coronado in a different commercial unit. A CI made numerous calls to defendants setting up defendants' mailing of methamphetamine to St. Louis and the CI wiring money back to defendants as payment for the methamphetamine. There was surveillance of defendants picking up the money. There is no question that there was a substantial basis for concluding that probable cause existed.

The only conceivable question that could be raised is whether the search of the motor home vehicle was included in the scope of the warrant. Although there is some evidence that the defendants lived there and thus it can be argued that it was their "residence," the Warrant specifically included all vehicles on or associated with Unit J in anyway. A motor home is included in the term vehicle. See United States v. Luna, 368 F.3d 876, 877 (8th Cir. 2004) (search of motor home resulted in discovery of "a suspicious panel on the vehicle's undercarriage..."); United States v. Pollington, 98 F.3d 341, 342 (8th Cir. 2004) (during search of motor home officers found marijuana and "during a further search of the vehicle" they found more marijuana).

The items seized pursuant to the Search Warrant should not be suppressed.

2.   **Recorded Calls**

It is well-established that a law enforcement agent or an informant may *record* conversations between himself/herself and another party without violating the Fourth Amendment or any other law. United States v. Sileven, 985 F.2d 962, 966 (8th Cir. 1993) citing United States v. White, 401 U.S. 745, 752 (1971); 18 U.S.C. § 2511(2)(c). Thus the recorded statements were

lawfully obtained and are admissible in evidence if otherwise qualified. Therefore, the defendants' motions to suppress electronic surveillance should be denied.

It is also clearly established that "Fourth Amendment rights are not violated when conversations with a government informant are electronically *monitored* by a government agent with the consent of the informant." Lewellen v. Raff, 843 F.2d 1103, 1116 (8th Cir. 1988), cert. denied, 489 U.S. 1033 (1989); quoting United States v. McMillan, 508 F.2d 101, 104 (8th Cir. 1974), cert. denied, 421 U.S. 916 (1975).

Of course, the informant's consent must be voluntary. In deciding the voluntariness of the consent, the court must look at the totality of the circumstances surrounding the events in question. United States v. Tangeman, 30 F.3d 950, 952 (8th Cir.), cert. denied, 513 U.S. 1009 (1994); United States v. Diaz, 685 F.2d 252, 254 (8th Cir. 1982); United States v. Kirk, 534 F.2d 1262, 1272 (8th Cir. 1976), cert. denied, 433 U.S. 907 (1977). In the present case, the CI knew what the officers were doing and repeatedly made phone calls with a law enforcement officer present. This is sufficient to establish consent. Diaz, 685 F.2d at 254; Kirk, 534 F.2d at 1272-73, citing McMillan, 508 F.2d at 104 n.2 ("[It] will normally suffice for the government to show that the informer went ahead with a call after knowing what the law enforcement officers were doing").

Here there were no threats or promises to induce the CI's cooperation. The only thing that was promised was that the agent would make the CI's cooperation known to the U.S. Attorney's Office. A defendant's or an informant's hope that cooperation would favorably influence the United States Attorney's Office or the judge does not diminish the voluntariness of the consent of a defendant or an informant to the monitoring and tape recording of his/her conversations. See Diaz, 685 F.2d at 254 (consent in exchange for making cooperation known to U.S. Attorney's Office and judge); Kirk, 534 F.2d at 1273 (consent in exchange for recommendation to prosecutor); United States v. Rich, 518 F.2d 980, 985 (8th Cir. 1975) (consent in exchange for promise of immunity), cert denied, 427 U.S. 907 (1976). The CI was not paid until all the calls were made. At that time, after expressing fear for her safety and a desire to move she was given $1,000. The Eighth Circuit

has specifically held that payment of a CI in cash for cooperation and testimony is permissible. United States v. Albanese, 195 F.3d 389, 394-95 (8th Cir. 1999). The recorded calls should not be suppressed.

**Defendant Ronald Kinney, Jr.'s Request and Motion for Specific Kyles and Brady Information. [Doc. 32]**

The government has responded that it is aware of its obligations under Brady v. Maryland, 373 U.S. 83 (1963) and will comply fully. The government agreed to provide the defendants, in advance of trial, a copy of the criminal records, if any, of its witnesses. The government also agreed to provide defendants, in advance of trial, any promises or agreements between the government and its witnesses. Because the government is conscious of its obligations under Brady, the court will grant the Motion to the extent of the government's offer to produce and deny the Motion in all other respects.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant Paul Kinney's Motion to Suppress Evidence and Statements be **DENIED**. [Doc. 34]

**IT IS FURTHER RECOMMENDED** that Defendant Paul Kinney's Motion to Suppress Interception of Electronic Communications be **DENIED**. [Doc. 33]

**IT IS FURTHER RECOMMENDED** that Defendant Ronald Kinney, Jr.'s Motion to Suppress Evidence and Statements be **DENIED**. [Doc. 30]

**IT IS FURTHER RECOMMENDED** that Defendant Ronald Kinney, Jr.'s Motion to Suppress Contents of Any Electronic Surveillance be **DENIED**. [Doc. 31]

**IT IS HEREBY ORDERED** that Defendant Ronald Kinney, Jr.'s Request and Motion for Specific Kyles and Brady Information is **GRANTED** to the extent of the government's offer to produce and **DENIED** in all other respects. [Doc. 32]

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this  21st   day of  July, 2005.