| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. SI4:05CR280ERW(MLM) |
| | ) | |
| PAUL KINNEY, RONALD KINNEY, JR., | ) | |
| MICHAEL SMITH and BARBARA JOHNSON, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE CONCERNING
## ELECTRONIC SURVEILLANCE BY MEANS OF A WIRETAP

This Report and Recommendation deals only with motions filed by the four above-named defendants in this eleven defendant case to suppress contents of electronic surveillance by means of a Title III wiretap.[1]  Pretrial matters were referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b).  This case is set for trial before the Honorable E. Richard Webber on December 12, 2005.

Because of the number of defendants who originally filed motions concerning electronic surveillance by wiretaps, two Evidentiary Hearings were scheduled.  The first, on September 16, 2005, was a full hearing at which the government's exhibits and documents were properly admitted and testimony was elicited followed by cross examination.  At this hearing, counsel for defendants Ronald Kinney, Jr. and Christina Smith participated.  The court made it clear that defense counsel were not to repeat objections and questions and that an objection or question by one applied to all. The court further noted, as it had in previous orders, that the defendants who had not waived hearing on Title III wiretap issues would be provided an expedited transcript of the 9/16/05 hearing

---

[1]	All other pending pretrial motions will be dealt with in separate R&Rs.

It is to be noted that numerous defendants withdrew on the record their previously filed pretrial motions or have given notice on the record that they did not intend to file pretrial motions: Carolyn Mayberry [173, waiver]; Christina Smith [163, 164, 165, withdrawn]; Elizabeth Williams [169, 170, 171, withdrawn]; Michelle Reinhert [176, withdrawn]; Barbara Johnson [168, only, withdrawn], John Radford [166, waiver]; Anna Foust [172, waiver].

as well as all of the government's evidence and documents, and if any defendant had further relevant non-repetitive questions, the court would make the witnesses available for cross examination at a hearing on September 29, 2005. On September 29, 2005, having reviewed the expedited transcript and all the evidence and documents, no further cross examination by any of the remaining defendants was requested.

## INDEX

I.    **Electronic Surveillance by Means of Title III Wiretap: 573-518-1819** . . . . . . 3

    A.    **Authorization and Application** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.    **Affidavit** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        1.    **Probable Cause** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        2.    **Previous Applications** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        3.    **Other Investigative Procedures** . . . . . . . . . . . . . . . . . . . . . . . . 19

    C.    **Court Order and Order to Service Provider** . . . . . . . . . . . . . . . . . . . . . 22

    D.    **Post Authorization Duties** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        1.    **Minimization** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        2.    **Ten Day Reports** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        3.    **Sealing** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    E.    **Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## I.       Electronic Surveillance by Means of Title III Wiretap: 573-518-1813

The government's documentary evidence is contained in a large binder. Gov.Ex.1. Each document is numbered and tabbed. The court incorporates by reference as if fully set out herein the entire volume of documents in the binder as well as Gov.Ex.2 in the pocket of the binder. The government properly admitted all of the documents and exhibits into evidence. At the hearing the government presented the testimony of Gerald Williams, a detective in the Jefferson County Sheriff's Department. Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witness, the undersigned makes the following findings of fact and conclusions of law with regard to the wiretap.

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 codified at 18 U.S.C. § 2501, *et seq.*, which provides for the interception of wire, oral or electronic communications, specifically permits an "aggrieved person" to move to suppress the contents of such interceptions on grounds that:

> (i)       the communication was unlawfully intercepted;
>
> (ii)      the order of authorization or approval under which it was intercepted is insufficient on its face;
>
> (iii)     the interception was not made in conformity with the order of authorization or approval.

18 U.S.C. § 2518(10)(a). This section also provides that upon filing such a motion, such portions of the intercepted communications or evidence derived therefrom shall, as the judge determines to be in the interests of justice, be made available to the aggrieved person. As an initial matter, in the present case, the government has made available to counsel for defendant all the documentary evidence as well as all of the intercepted communications. The court finds that this portion of the statute has been meticulously observed by the government.

Title III sets forth a comprehensive legislative scheme regulating the interception of oral and wire communications. "This legislation attempts to strike a delicate balance between the need to protect citizens from unwarranted electronic surveillance and the preservation of law enforcement

tools needed to fight organized crime." <u>United States v. Phillips</u>, 540 F.2d 319, 324 (8th Cir. 1976). The statute provides for the interception of wire, oral and electronic communications only under certain circumstances and only if specific procedures are followed. The undersigned will take up in order the procedures required by the statute.

## A.     Authorization and Application

18 U.S.C. § 2516 provides that the Attorney General of the United States may specially designate the Assistant Attorney General, any Acting Assistant Attorney General, any Deputy Assistant Attorney General or any Acting Deputy Assistant Attorney General of the Criminal Division to exercise the power conferred on the Attorney General by 18 U.S.C. § 2516 to authorize an application to a federal district judge for an order authorizing the interception of wire, oral and electronic communications. The government introduced and attached to its Application copies of the Attorney General's Order of Special Designation, Order No. 2758-2005, dated February 24, 2005, and the letter of Authorization for Interception Order Application, dated March 4, 2005. (Tab 1, Attachments). An authorization for such an application is presumed to be valid unless the person challenging the application makes a prima facia showing that it was not so authorized. <u>See United States v. O'Connell</u>, 841 F.2d 1408, 1416 (8th Cir. 1988), <u>cert.denied</u>, 488 U.S. 1011 (1989). In this case, the defendants did not challenge the authorization and the court finds that all requirements of 18 U.S.C. § 2516 regarding the authorization were fully observed.

The application for a wiretap must include the identity of the law enforcement officer making the application, the person authorizing the application, a full and complete description of the facts relied on, including details of the alleged offense; a description of the facilities where the communications are to be intercepted; a description of the communication sought to be intercepted; the identity of the persons whose communications will be intercepted; whether other investigative procedures have been tried; and the period of time for which the interception is requested. The application must also indicate whether previous applications involving the same facilities, persons

or places have been made.  18 U.S.C. § 2518(1).  The application may include additional evidence in support.  18 U.S.C. § 2518(2).

Here the Application (Tab 1) contained all of the statutorily required elements: it contained the identity of the law enforcement officer making the application,  an authorization from an Assistant Attorney General designated to make such authorization, and included the items regarding the persons, places and communications sought to be intercepted.  It also indicated that it sought to intercept communications for no more than thirty days and described all previous applications, of which there were none.  There was no error in the form of the Application.  Pursuant to 18 U.S.C. § 2518(2), the Application was supported by an Affidavit. (Tab 2).  This Affidavit expanded and described in detail the information contained in the Application including a full and complete statement of the facts and circumstances relied upon by the applicant to justify the belief that an order should be issued including:

> (i) details as to the particular offense that has been, is being, or is about to be committed, (ii) except as provided in subsection (11) a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (iii) a particular description of the type of communication sought to be intercepted, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted.

18 U.S.C. § 2518(b).  The Application complies fully with the statute.

B.      Affidavit

As noted above, the court incorporates by reference as if fully set out herein the Affidavit submitted by Gerald Williams.[2]  However, a general summary may prove helpful.  This summary does not include all of the information in the Affidavit but is intended merely to assist the court.  The entire Affidavit as submitted in Tab 2 is the basis of the probable cause.  The Affidavit

---

[2]      Gerald Williams has been a detective in the Jefferson County Sheriffs Department for five and one-half years.   For approximately the past year he has been detached to the Drug Enforcement Administration ("DEA").  He has received training in the identification of controlled substances and the methods of operations of drug traffickers.

submitted by Task Force Officer ("TFO") Williams states that he is an investigative and law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7) and is empowered by law to conduct investigations of and make arrests for offenses enumerated in 18 U.S.C. § 2516. The Affidavit states there is probable cause to believe that certain "target subjects", Paul Kinney, Carolyn Annette Mayberry, Christina Smith, Jason Wisdom, Tamara Montgomery, Michael Smith, Ronald Kinney, Jr., Bruce Marler, Ronda Long, Charles Bieser, Randall Woods, Alfredo Vallarino, Saundra Sherffius, and Michelle Reinhert and others yet unknown, were committing and conspiring to commit violations involving possession with intent to distribute and distribution of methamphetamine, the unlawful use of a communications facility to facilitate distribution of a controlled substance, a continuing criminal enterprise, interstate travel to facilitate a narcotics business and money laundering.

The Affidavit states that the target hard line telephone, 573-518-1819 (the "target telephone") was subscribed to Jason Wisdom and utilized by Carolyn Mayberry. The authorization requested was intended to apply not only to the target telephone but to any changed telephone number subsequently assigned to the same cable, pair, and binding post utilized by the target land line telephone within a thirty (30) day period. The Affidavit further states that the requested authorization be intended to apply to background conversations intercepted in the vicinity of the target residential telephone while the target telephone was "off-hook" or otherwise in use.

The Affidavit further states that there is probable cause to believe that particular wire and electronic communications of the target subjects and others yet unknown, concerning the above-named offenses, would be obtained through the interception of wire communications to and from the target telephone. In particular, these communications were expected to concern the specifics of the above-named offenses, including (1) the nature, extent and methods of operation of the drug distribution of the target subjects, and others yet unknown; (2) the identities and roles of accomplices, aiders and abetters, co-conspirators and participants in their illegal activity; (3) the distribution and transfer of the contraband and money involved in those activities; (4) the existence

and location of records pertaining to those activities; (5) the location and source of resources used to finance their illegal activities; (6) the location and disposition of the proceeds from those activities; and (7) the locations of items used in furtherance of those activities. In addition, the communications were expected to constitute admissible evidence of the commission of the above-described offenses.

The Affidavit gives the pedigree and arrest record of each of the named subjects, most of which are quite extensive.

The Affidavit indicates that based on record checks of the Drug Enforcement Administration, the Federal Bureau of Investigation and the Bureau of Immigration and Customs Enforcement completed on March 2, 2005, there was no application for an order authorizing the interception of the wire, oral, or electronic communications involving the target telephone or the target subjects.

The Affidavit summarizes the background of the investigation. Since January, 2002 DEA, the State of California Department of Justice, Bureau of Narcotic Enforcement, ("BNE") and the Park Hills, Missouri Police Department conducted investigations which developed information relating to methamphetamine trafficking of the Paul Kinney organization. A substantial amount of intelligence gathered during these investigations was through the use of such law enforcement activities as surveillance, pen registers, toll analysis, interviews of confidential sources, search warrants and document analysis.

In November, 2004 DEA agents from the St. Louis Division initiated an investigation of the Paul Kinney organization which indicated that the organization was currently distributing multi-pound quantities of methamphetamine throughout St. Francois County, Missouri, Anaheim, California and other locations throughout the United States. The investigation revealed that the organization manufactures methamphetamine in laboratories located in the Anaheim, California area and uses sources of supply for methamphetamine located in California which are affiliated with Mexican criminal gangs.

The Affidavit indicates that the Paul Kinney organization primarily consists of family members of Paul Kinney and close/trusted associates located in Park Hills, Missouri and Anaheim, California. Ronald Kinney, Jr. is the biological brother of Paul Kinney and was identified as a high ranking member, facilitator and methamphetamine manufacturer for the Paul Kinney organization. Carolyn Mayberry, a former paramour of Ronald Kinney, Jr., was identified as the St. Francois County, Missouri regional manager/distributor for the Paul Kinney organization.

The Affidavit summarizes the nature of the investigation and then describes activities and events in great detail. Generally, the organization was known to use violence in relation to its drug trafficking activities. Search warrants and law enforcement contacts led to the seizure of several handguns, assault rifles and shotguns from members of the organization. Several of the target subjects have violent felony criminal records to include weapons violations, threatening witnesses, resisting arrest, burglaries and felony assaults. In January, 2000 Paul Kinney was arrested for the manufacture with intent to distribute methamphetamine (as further detailed in Significant Event #1 of the Affidavit). During this arrest Paul Kinney was found in possession of two assault rifles, an Uzi sub-machine gun and two shotguns. In addition, as related in the Confidential Sources section of the Affidavit, CS #3 was held against his/her will by Carolyn Mayberry and Randy Woods when they believed CS #3 might possibly be cooperating with law enforcement.

The Affidavit indicates that the Paul Kinney organization used Federal Express and United Parcel Service to ship packages of methamphetamine to St. Francois County, Missouri as well as other locations in the United States. Upon arrival in St. Francois County, Missouri methamphetamine was delivered through a network of retail distributors managed by Carolyn Mayberry. In turn, she sent money to Paul Kinney by way of Western Union money orders and postal package shipments for the methamphetamine. This general summary is then particularized.

Confidential Sources were used extensively. Confidential Source #1 ("CS #1") had known brothers Paul Kinney and Ronald Kinney, Jr. for approximately six years. CS #1 was aware of Paul Kinney's residence and had two phone numbers at which he/she could contact him. CS #1 gave

information that Paul Kinney is the leader of a large scale methamphetamine distribution organization operating out of the Anaheim, California area. CS #1 stated that the organization distributes multi-pound quantities of methamphetamine in and about Anaheim and operates multiple methamphetamine laboratories in that area. CS #1 had personally observed the manufacture of methamphetamine by the Paul Kinney organization and had personally obtained quantities of methamphetamine from the organization. CS #1 stated that Ronald Kinney, Jr. is the manager of the methamphetamine laboratories for the organization. The Paul Kinney organization has separate sources of supply for methamphetamine located in Los Angeles which are affiliated with Mexican criminal gangs. At the time of the drafting of the Affidavit, CS #1 was no longer cooperating with the investigative team and was unwilling to provide further information. The information provided by CS #1 was limited in regards to structure, number of members their prospective roles and the scope of the organization.

Confidential Source #2 ("CS #2") provided information from approximately November through the end of December, 2004 about the Paul Kinney organization. The information provided by CS #2 was corroborated by other types of investigative methods and was therefore considered reliable. CS #2 provided information that led to the seizure of drugs, weapons and the arrest of multiple defendants. CS #2 had prior felony drug offenses and was cooperating with the investigative team for possible assistance regarding the offenses. CS #2 was not financially compensated for his/her cooperation. CS #2 gave information obtained during the five years he/she had known Paul Kinney. CS #2 was aware of Paul Kinney's residence address and that it was in an office/industrial park facility. CS #2 indicated that Paul Kinney used 3910 East Coronado, Unit G, in Anaheim as a location to manufacture methamphetamine. The Affidavit notes that on October 16, 2004 Christina Smith sent a Western Union money order in the amount of $900 to Alfredo Vallarino at the Unit G address. This is further detailed in the analysis of Western Union records section of the Affidavit. CS #2 had contact phone numbers for Paul Kinney and a contact cell phone number. CS #2 confirmed the information received from CS #1 about the large scale

methamphetamine distribution organization and indicated that Paul Kinney manufactured multi-pound amounts of methamphetamine in multiple laboratories. CS #2 stated that Paul Kinney had been arrested and served time in a California state prison for the manufacture of methamphetamine. CS #2 was a distributor for the Paul Kinney organization. He/she had purchased pound quantities of methamphetamine from defendant Paul Kinney on multiple occasions over the two years preceding the Affidavit. CS #2 indicated he/she would pay approximately $7,000 - $10,000 for each pound of methamphetamine he/she purchased from Paul Kinney. At the time of the Affidavit, CS #2 was no longer cooperating with the investigative team and was unwilling to provide further information. The information provided by CS #2 was limited in the same manner as the information provided by CS #1.

Confidential Source #3 ("CS #3") provided law enforcement agents with information regarding the Paul Kinney organization since November, 2004. The information was corroborated by other investigative methods and was therefore considered reliable. The information provided by CS #3 led to the seizure of approximately two pounds of methamphetamine from the Paul Kinney organization, further detailed in Significant Event #5 of the Affidavit. CS #3 has a prior felony conviction for a drug offense and cooperated with the investigative team for possible assistance regarding a probation violation. CS #3 was not financially compensated for his/her cooperation. CS #3 stated he/she had known Paul Kinney, Ronald Kinney, Carolyn Mayberry and Christina Smith for approximately five years. CS #3 was aware of the fraternal relationship between Paul Kinney and Ronald Kinney, Jr. and knew that Carolyn Mayberry is the mother of three of Ronald Kinney, Jr.'s children. Carolyn Mayberry and Christina Smith are first cousins. CS #3 was aware of Paul Kinney's residence in Anaheim and had several contact numbers at which he/she could reach him. CS #3 stated that Carolyn Mayberry resides at 217 Houser Street in Park Hills, Missouri with her brother, Jason Wisdom. CS #3 could contact Carolyn Mayberry at the target telephone number, 573-518-1819. CS #3 was aware of the residence of Christina Smith and had a

contact number for her. CS #3 was fully aware of the nature of the large scale methamphetamine distribution organization run by Paul Kinney.

CS #3 indicated that he/she purchased ounce quantities of methamphetamine from Carolyn Mayberry on multiple occasions over the last five years, paying approximately $1600 for each ounce of methamphetamine. CS #3 also lived with Carolyn Mayberry starting in the summer of 2004 until late November, 2004. CS #3 acted as a "lieutenant" for Mayberry and sent money on behalf of Mayberry to Paul Kinney.

CS #3 stated that beginning in approximately September, 2004 Carolyn Mayberry began to receive pound quantities of methamphetamine from Paul Kinney by way of Federal Express and United Parcel Service. CS #3 was present when several of these packages were opened by Carolyn Mayberry. Significant Events #5 and #7 corroborate the information about the methods of packing the methamphetamine in plastic zip lock bags given by CS #3. CS #3 stated that Carolyn Mayberry would call Paul Kinney from the target telephone to arrange the shipments and to confirm the arrival of the packages. CS #3 was present on numerous occasions when Mayberry spoke with Paul Kinney and overheard Mayberry discussing the shipments over the target telephone. All the phone calls involved drug trafficking. CS #3 stated that Carolyn Mayberry paid approximately $600 for each ounce of methamphetamine and that she would then cut the methamphetamine with a powdered vitamin called Methyl-Sulfonyl-Methane (MSN). CS #3 assisted in obtaining the MSN and cutting the methamphetamine at the direction of Mayberry. Carolyn Mayberry would sell each ounce of cut methamphetamine for approximately $1600. Carolyn Mayberry used a portion of her profits to make renovations to her residence.

CS #3 stated that Carolyn Mayberry distributed methamphetamine through a group of retail distributors located in Park Hills, Missouri. CS #3 identified at least ten of Carolyn Mayberry's methamphetamine distributors. CS #3 stated Carolyn Mayberry sent Paul Kinney money for the purchase of the methamphetamine by way of Western Union money orders made out to Paul Kinney, Ronald Kinney, Jr. or Alfredo Vallarino. CS #3 stated that Carolyn Mayberry also directed

other named targets to send money on her behalf to Paul Kinney by way of Western Union money orders for the purchase of methamphetamine. These money orders were all in amounts less than $1000 to avoid suspicion. Larger amounts of money sent to Paul Kinney would be broken down into several smaller money orders. CS #3 stated Carolyn Mayberry would call Paul Kinney on the target telephone to arrange the wire transfers of the money orders and confirm they had been picked up in California. CS #3 stated Mayberry frequently used the target telephone to call Paul Kinney and to receive calls from Paul Kinney on a regular basis.

CS #3 stated that following the seizure of two pounds of methamphetamine in November, 2002, further detailed in Significant Event #4, Carolyn Mayberry believed her house was being watched and that someone was acting as a confidential source for law enforcement. Carolyn Mayberry and Paul Kinney discussed utilizing different methods of transporting methamphetamine and sending money. CS #3 stated Carolyn Mayberry became suspicious of CS #3 following the seizure of the two pounds of methamphetamine and accused CS #3 of being a "snitch" for law enforcement and physically threatened him/her. CS #3 stated Carolyn Mayberry and Randy Woods locked CS #3 in the bedroom in Carolyn Mayberry's residence. CS #3 stated that Carolyn Mayberry told CS #3 that he/she would be held until Carolyn Mayberry could determine whether CS #3 was a "snitch." CS #3 stated that he/she was able to escape from Carolyn Mayberry's residence and has not seen or spoken to her since that time. CS #3 fears for his/her personal safety from Carolyn Mayberry and Randy Woods. CS #3 was incarcerated in December of 2004 and at the time of the Affidavit, remained incarcerated. CS #3 stated he/she is no longer trusted by Mayberry and has not had any contact with her or other members of the organization.

In addition to the use of confidential sources, certain **significant events** contributed to the investigation of the Paul Kinney organization.

Significant Event #1 occurred on February 29, 2000 when officers from the State of California Department of Justice, Bureau of Narcotic Enforcement (BNE) executed a California state search warrant on 3860 Coronado Street, Unit J and 3910 Coronado Street, Unit G after numerous

surveillances, during which BNE officers observed Paul Kinney and Ronald Kinney, Jr. enter and exit both units. The search warrants resulted in the seizure of approximately ten pounds of methamphetamine, three gallons of methamphetamine in solution, two assault rifles, an Uzi sub-machine gun, two shotguns, laboratory equipment and the arrests of six defendants. Paul Kinney was arrested for the methamphetamine and was subsequently prosecuted.

Significant Event #2 took place on August 29, 2004 when Michelle Reinhert placed a recorded telephone call from the St. Francois County Jail to the target telephone number. The call was confirmed by both jail phone records and toll records for the target telephone. Michelle Reinhert asked Carolyn Mayberry to place a "three way" telephone call to Megan LNU. Based on the training and experience of the investigative team, TFO Williams believed that Carolyn Mayberry, Michelle Reinhert and Megan LNU were discussing illegal drugs that were hidden at the residence of Michelle Reinhert. Further, Michelle Reinhert wanted Carolyn Mayberry and Megan LNU to remove the illegal drugs from her residence in order to avoid their discovery by law enforcement.

Significant Event #3 took place on August 31, 2004 when Randy Woods placed a recorded telephone call from the St. Francois County Jail to the target telephone. The call was verified by the jail phone records and the toll records for the target telephone. Based on the training and experience of the investigative team, TFO Williams believed this conversation concerned Randy Woods warning Carolyn Mayberry to be cautious while distributing illegal drugs because he believed some of their customers may be acting as confidential sources for law enforcement.

Significant Event #4 took place on September 18, 2004 when Michelle Reinhert's biological son, Jeff, placed a recorded telephone call from the St. Francois County Jail to the target telephone. The call was confirmed by jail telephone records and the toll records for the target telephone. Based on the training and experience of the investigative team, TFO Williams believed the conversation concerned Michelle Reinhert sending money by way of Western Union money orders to Paul Kinney on behalf of Carolyn Mayberry. On October 6, 2004 and October 8, 2004 Michelle Reinhert sent

Western Union money orders to Paul Kinney as further detailed in the analysis of Western Union documents section of the Affidavit.

Significant Event #5 concerned a two pound package of methamphetamine which was supposed to be shipped from Paul Kinney to Carolyn Mayberry. On November 22, 2004 CS #3 told the investigative team that the next day Paul Kinney would be sending a package by United Parcel Service ("UPS") next day delivery containing methamphetamine to Carolyn Mayberry. The investigative team requested UPS place a "lookout" for such a package. Upon locating the package, a police narcotics canine alerted to the presence of illegal drugs. A Missouri state search warrant was obtained for the intercepted package and upon execution of the warrant the package was found to contain approximately two pounds of methamphetamine which was then seized. Telephone toll records of the target telephone, a cellular telephone utilized by Paul Kinney and a hard line telephone used by Paul Kinney indicate numerous phone calls between Paul Kinney and Carolyn Mayberry. Based on the training and experience of the investigative team, TFO Williams believed that Carolyn Mayberry used the target telephone on November 22nd, 23rd, and 24th to contact Paul Kinney to coordinate the shipment of the two pounds of methamphetamine seized from the UPS package. When the package did not arrive, Carolyn Mayberry used the target telephone to confer with Paul Kinney regarding the location of the package. UPS records including its website noted the shipment was received by Detective Rigel of the Park Hills, Missouri Police Department who was the affiant on the search warrant and seized the package. Shortly thereafter Det. Rigel reported he started receiving phone calls on his home telephone which caller I.D. reflected was from locations in various states including Arizona, California, Florida and North Carolina. In each instance the caller would hang up. These called increased until the officer was receiving a dozen such calls each day. He had not received these types of calls before the seizure and was therefore relocated for a period of time for officer's safety.

Significant Event #6 concerned the use of a rental car to transport illegal drugs. In December, 2004 law enforcement agents conducting surveillance observed Paul Kinney operating

a rental car registered to Enterprise Rental Cars and rented by Ronald Kinney, Jr. with Paul Kinney listed as a driver. Enterprise advised the investigators that Ronald Kinney, Jr. was contacted on 12/30/04 and 12/31/04 regarding money he owed for the rental car. Ronald Kinney, Jr. said he would come in to settle the matter and Enterprise advised the investigative team that someone dropped off the rental car on the Enterprise rental lot after hours on December 31st with the keys locked in the car. A narcotics canine conducted a search of the rental car and alerted to the presence of the illegal drugs. However, no drugs were located. Based upon his training and experience TFO Williams was aware that the police narcotic canine alert indicated that illegal drugs had previously been present in the rental car. Ronald Kinney, Jr. had rented this vehicle from November 2, 2004 to December 31, 2004. The rental car had been driven 5,971 miles during this time period. CS #3 stated that following the seizure of the two pound package of methamphetamine from the UPS package during November, as detailed in Significant Event #5, the Paul Kinney organization began to utilize couriers and rental cars to transport methamphetamine. Based on the training and experience of the investigative team, TFO Williams believed that the Paul Kinney organization used the rental car to transport illegal drugs.

Significant Event #7 took place on January 5, 2005. Bruce Marler called the Park Hills, Missouri Police Department and left a message that he wanted Det. Rigel to call him on a hard line telephone subscribed to by his mother. Det. Rigel's home telephone caller identification revealed that that hard line number had contacted his home telephone earlier that date. CS #3 had identified Bruce Marler as a methamphetamine distributor for the Paul Kinney organization. UPS inadvertently listed Det. Rigel's name on their package tracking website as having possession of the two pounds of methamphetamine seized on November 24, 2004. Later on January 5th Det. Rigel placed a recorded telephone call to Bruce Marler. Toll records reveal that shortly thereafter the hard line telephone used by Bruce Marler contacted the target telephone. Based on the training and experience of investigative team, TFO Williams believed that the Paul Kinney organization used the UPS package tracking website to identify Det. Mark Rigel. Further, Bruce Marler, at the direction

of the organization, was attempting to determine if Det. Rigel was conducting a criminal investigation regarding the two pounds of seized methamphetamine from the UPS package sent to Carolyn Mayberry. TFO Williams further believed that Bruce Marler contacted Carolyn Mayberry on the target telephone to report his findings.

Significant Event #8 began on November 23, 2004, the day the two pound methamphetamine package was shipped to Carolyn Mayberry. The shipper also shipped a UPS package to Steve Unruh in Shawnee, Oklahoma. Federal Express placed a lookout on the Shawnee, Oklahoma address and in February, 2005 Federal Express notified the investigative team that it located a package addressed to the vacant building next door to Steve Unruh's residence. A police narcotics canine alerted to the presence of illegal drugs and an Oklahoma state search warrant was executed on the intercepted package. The package contained a plastic zip lock bag containing approximately one pound of methamphetamine. This methamphetamine was hidden within a cardboard box containing a computer cooling fan. CS #3 had previously stated that the UPS and FedEx packages sent to Carolyn Mayberry by Paul Kinney contained methamphetamine stored in plastic zip lock bags hidden within boxes containing computer parts as further detailed in the Confidential Sources section of the Affidavit. Paul Kinney had previously used 3910 Coronado, Unit G to operate a methamphetamine laboratory and on October 16, 2004 Christina Smith sent a Western Union money order in the amount of $900 to Alfredo Vallarino at the East Coronado address which bore a telephone number of a hard line telephone used by Paul Kinney as further detailed in the Analysis of Western Union records section of the Affidavit. On January 14, 2004 pen register records reflect that two calls were placed over the target telephone to the 800 number utilized by UPS customers to check the status of packages. Based on the training and experience of the investigative team, TFO Williams believed that the one pound package of methamphetamine contained in the Federal Express package was shipped by Paul Kinney to Steve Unruh. Further, TFO Williams believed that this shipment demonstrated how the Paul Kinney organization was then

using alternative addresses and false names to ship methamphetamine packages in light of the November 24, 2004 seizure of the package sent to Carolyn Mayberry.

Paragraphs 56-65 of the Affidavit detail an analysis of **Federal Express and United Parcel Service records** between the Paul Kinney organization and Carolyn Mayberry for the year 2004. The records are detailed and significant and are followed with phone calls between Carolyn Mayberry and Paul Kinney to coordinate the shipment of packages. These phone calls are documented in toll records. Based on the training and experience of the investigative team and the information provided by CS #3, TFO Williams believes that these packages were shipments of methamphetamine from the Paul Kinney organization and that Carolyn Mayberry used the target telephone to coordinate the shipment of the packages.

**Western Union records** were also analyzed and paragraphs 66-77 of the Affidavit detail the analysis of these records. CS #3 had previously stated that Carolyn Mayberry utilized Western Union to pay for methamphetamine shipments from the Paul Kinney organization. Western Union records for Carolyn Mayberry and others identified as members of the organization are confirmed in the Western Union money order records. Based on the training and experience of the investigative team and the information received from CS #3, TFO Williams believed that all of the Western Union money orders were for the purchase of methamphetamine from the Paul Kinney organization and that Carolyn Mayberry utilized the target telephone to coordinate the payments. The target telephone was also the subject of **pen register analysis**. On December 31, 2004 United States Magistrate Judge David D. Noce signed an order authorizing the installation of a pen register/trap and trace device on the target telephone for a period of sixty days, based on TFO Williams' belief that the target telephone was being used by Carolyn Mayberry to manage the purchase and distribution of illegal drugs. Paragraphs 78-79, with numerous sub parts, detail the pen register analysis which indicates that during the sixty days authorized by Judge Noce, there were over 1000 calls between the target telephone and the hard line telephones and cell phones used by persons who were targets of the investigation.

Based on the training and experience of the investigative team and all of the facts set forth in the Affidavit, it was TFO Williams' belief that the interception of wire communications was the only investigative technique that had a reasonable likelihood of success by assisting to secure the evidence needed to prove beyond a reasonable doubt that the target subjects and others not yet identified were acting as a part of the Paul Kinney organization and were engaged in the distribution and sale of methamphetamine and the laundering of monetary proceeds.

1.      **Probable Cause**

Under 18 U.S.C. § 2518(3) the court may issue an order authorizing the interception of wire, oral or electronic communications only if it finds probable cause to believe that (1) a person is committing, has committed or is about to commit one of the crimes enumerated in 18 U.S.C. § 2516; (2) communications concerning such crimes will be obtained through the interception; (3) normal investigative procedures have been tried; and (4) the place where the communications are to be intercepted is being used in connection with the commission of such crimes or is being used by a target subject.  Even from the general summary set out in the findings of fact above, it clear that the Affidavit provided probable cause that the defendants were conspiring to commit and were committing the violations enumerated above.  It is also clear that communications concerning these offenses would be obtained through the interception and that the places where communications were to be intercepted were being used in connection with the offenses.

Courts must test applications for wiretaps and eavesdropping in a "'practical and common sense fashion'".  United States v. Garcia, 785 F.2d 214, 221-22 (8th Cir. 1986) quoting United States v. Brick, 502 F.2d 219, 224 n.14 (8th Cir. 1974).  See also United States v. Ventresca, 380 U.S. 102, 109 (1965).  Those against whom the resulting evidence is admitted have the burden of proving the wiretap was unlawfully obtained or used.  Garcia, 785 F.2d at 222; United States v. Phillips, 540 F.2d 319, 385 (8th Cir.), cert. denied, 429 U.S. 1000 (1976).  Probable cause for the issuance of a wiretap should be evaluated under the same standard used to evaluate probable cause for the issuance of a search warrant.  United States v. Fairchild, 189 F.3d 769, 775 (8th Cir. 1999).  "Specifically, probable

cause is present if the totality of the circumstances reveals that there is a fair probability that a wiretap will uncover evidence of a crime." <u>Fairchild</u>, 189 F.3d at 775. In this case, there is no question that the Application and Affidavit contain the fair probability that the wiretap would uncover evidence of a crime.

## 2. Previous Applications

Pursuant to 18 U.S.C. § 2518(1)(e), the Affidavit fleshes out the Application on the issue of prior applications. It says that the affiant caused a search of computerized data bases of the FBI, DEA and ICE files and that he is not aware of any previous wire, oral or electronic interception applications for the named target or facilities to be intercepted. In the instant case, the Application and Affidavit comply fully with 18 U.S.C. § 2518(1)(e) on the issue of previous applications.

## 3. Other Investigative Procedures

Pursuant to 18 U.S.C. 2518(1)(c), the Affidavit fleshes out the Application on the issue of "whether or not other investigative procedures have been tried and failed or why they reasonably appear unlikely to succeed if tried or to be too dangerous." <u>Id</u>. The wiretap should be necessary and reasonable, however, "... investigators need not exhaust specific or all possible investigative techniques before a court can issue a wiretap order." <u>United States v. Jones</u>, 801 F.2d 304-314 (8th Cir. 1986). <u>See</u> <u>also</u> <u>United States v. Macklin</u>, 920 F.2d 1320, 1326-27 (8th Cir. 1990), <u>cert.denied</u>, 489 U.S. 1031 (1991); <u>United States v. Smith</u>, 909 F.2d 1164, 1166 (8th Cir. 1990), <u>cert. denied</u>, 498 U.S. 1032 (1991).

> [The Eighth Circuit] held in <u>United States v. Daly</u>, 535 F.2d 434, 438 (8th Cir. 1976) that the necessity requirement of Section 2518 was meant to insure that wiretaps are not routinely employed as the initial step in an investigation. Thus while the statute does require that normal investigative procedures be used first, it does not require that law enforcement officers exhaust all possible techniques before applying for a wiretap. [<u>United States v.</u>] <u>Leisure</u>, 844 F.2d [1347,] 1356 [(8th Cir.), <u>cert. denied</u>, 488 U.S. 932 (1988)]; <u>United States v. O'Connell</u>, 841 F.2d 1408, 1415 (8th Cir.), <u>cert.denied</u>, 487 U.S. 1210 (1998)...the government is simply not required to use a wiretap only as a last resort. <u>United States v. Matya</u>, 541 F.2d 741, 745 (8th Cir. 1976), <u>cert.denied</u>, 429 U.S. 1091 (1977).

<u>United States v. Macklin</u>, 902 F.2d 1320, 1326 (8th Cir. 1990), <u>cert.denied</u>, 489 U.S. 1031 (1991). In the Affidavit, the government describes in detail the other investigative techniques employed. See Affidavit, Tab 2 at p. 58-77. Interviews of subjects or associates were considered. However, it was believed by all of the investigators involved that interviews would not be successful regarding the drug trafficking activities addressed in the Affidavit because most of the subjects of the investigation live in the small community of Park Hills, Missouri where most of the residents know each other. In addition, attempts to interview Paul Kinney and Ronald Kinney, Jr. were unsuccessful.

In addition, interviewing members of the conspiracy would alert them to the existence of the investigation causing them to become more cautious in their activities, to flee to avoid further investigation or prosecution, to threaten the lives of cooperating co-conspirators or to otherwise compromise the investigation.

Although pen registers and telephone toll records identified several individuals involved in the defendant's organization, their position in the organization was not known. Without knowing what position a subject held in the organization, it was impossible to determine which members of the organization would be able to provide further information by way of interview, providing the person would be willing to talk to investigators at all. Pen registers could not provide evidence of criminal activity.

Mobil tracking devices were considered but the Paul Kinney organization used multiple vehicles and rental vehicles making it impossible to pick one vehicle to install a GPS. In addition such devices only provide limited information.

In addition, the investigators did not believe that the use of Grand Jury subpoenas for testimony from witnesses would be useful in the early stages of the investigation. Administrative and Grand Jury subpoenas were, however, utilized to obtain telephone records and financial records. The records provided valuable but limited information. Based on the Affiant's experience and that of the Assistant United States Attorney, the Affiant believed that subpoenaing persons believed to be involved in the conspiracy and their associates before a Federal Grand Jury would not be

successful in achieving the stated goals of the investigation. First, they would most likely be uncooperative and invoke their Fifth Amendment privilege not to testify. It would be unwise to offer any kind of immunity for these persons because without more knowledge of the structure and composition of the method of operation for the organization, the granting of such immunity might foreclose prosecution of the most culpable members and could not insure that such immunized witnesses would provide truthful testimony. In addition, the service of Grand Jury subpoenas upon principals of the conspiracy would only alert them to existence of the investigation, causing them to become more cautious, to flee to avoid further investigation or prosecution, to threaten the lives of the informants or otherwise compromise the investigation.

Confidential sources were utilized with limited success. None of the CS's utilized could fully penetrate the organization. The small community of Park Hills posed a problem for infiltration of an organization comprised of family members and long-time acquaintances. The CS's used were not in a position to know the full structure of the organization, to explain the roles of the members of the organization or to identify all sources of supply. CS#1 and #2 were no longer cooperating and CS #3 was incarcerated. The use of the CS's could not accomplish the goals of the investigation.

Undercover agents could not infiltrate the conspiracy at a high enough level to identify the members of the conspiracy or otherwise satisfy the goals of the investigation.

Search warrants, based on the Affiant's experience, would not in all likelihood lead to a considerable quantity of narcotics, money other evidence nor would the searches be likely to reveal the total scope of the illegal operation and the identities of the co-conspirators. Additionally, search warrants would alert the subjects to the existence of the investigation. Some search warrants were used and recovered significant amounts of methamphetamine and allowed for the limited prosecution of Paul Kinney but did not provide the full scope of the organization, or provide knowledge of the location of all the manufacturing and storage facilities. The Title III wiretap would assist the investigative team in maximizing the further use of search warrants.

Police records were used to review past criminal histories but were only of limited value. They could not provide evidence of current criminal activity.

Based on the foregoing, it was the Affiant's belief that the interception of wire communications over target telephone 573-518-1819 was an essential investigative means in obtaining evidence of the offenses in which the subject and others yet unknown were involved. The investigative means, until the date of the application, including the undercover buys and surveillances, were not sufficient evidence of the scope of defendant's drug trafficking organization, the identity and roles of all the members of the organization or the identity of all sources of supply. The Affiant believed that this evidence could only be obtained by the interception of wire communications over the target cellular telephone.

In this case, the Affidavit explains why some procedures would likely fail in this case. The statute does not require more. <u>Macklin</u>, 102 F.2d at 1327. Some of the investigative techniques, while initially successful, failed to reveal the full scope of the conspiracy or present sufficient evidence against known participants. <u>United States v. O'Connell</u>, 841 F.2d 1408, 1415 (8th Cir. 1988), <u>cert.denied</u>, 488 U.S. 1011 (1998)(wiretap necessary even though much evidence had been collected prior to wiretap authorization; information revealed far-flung conspiracy which presented more difficult investigative problems.) In the present case, the Affidavit sets out precisely what was tried, how successful it was and what was not tried and why not. The necessity for a wiretap was fully demonstrated. <u>United States v. Shaw</u>, 94 F.3d 438, 441 (8th Cir. 1996), <u>cert.denied</u>, 514 U.S. 1100 (1997).

## C.    Court Order and Order to Service Provider

If a judge finds probable cause as set out above and also finds that other investigative techniques have been tried and failed or are unlikely to succeed if tried or were too dangerous, he may issue an order authorizing the interception of wire, oral or electronic communications. Under 18 U.S.C. § 2518(4), the order must specify the identity of the persons whose communications are to be intercepted, the nature and location of the communication facilities where the intercept is

granted, the type of communications to be intercepted, the identity of the agency and the person performing the interception in the period of time during which the interception is authorized. The period of time may not be longer than thirty days unless an extension is granted. 18 U.S.C. § 3518(5).

In the present case, the Order signed by the Honorable Catherine D. Perry on March 7, 2005 (Tab 3) complies in all respects with the statute. She found probable cause that the named targets and others then unknown had committed, were committing and would continue to commit offenses involving methamphetamine possession and distribution as well as crimes related to these offenses. She also found probable cause that communications concerning those offenses would be obtained through the interceptions and specifically named the target telephone number. She also found normal investigative procedures had been tried and failed, reasonably appeared to be unlikely to succeed or were too dangerous. The Order provided for a thirty day period of interception and further ordered that the authority (as requested in the application) applied not only to the target cellular telephone but to any changed telephone numbers or any other telephone numbers subsequently assigned to the same electronic serial number (ESN) as the target cellular telephone within the thirty day period. The Order included any background conversations intercepted in the vicinity of the target phone while the phone was off the hook. The monitoring officers were also directed that the interception be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this statute. The Order complies in all respects with the statute.

E.     **Post-Authorization Duties**

Title III imposes certain post-authorization duties which include conducting the interceptions in such a way as to minimize the interception, providing periodic reports to the court, sealing the documents and recordings and sending an inventory/notice to those whose conversations were intercepted.

1.     **Minimization**

18 U.S.C. § 2518(5) provides:

**Every order and extension thereof shall contain a provision that the authorization to intercept...shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter... . In the event the intercepted communication is in a code or foreign language and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.**

Judge Perry's Order authorizing the wiretap contained such a minimization requirement.  Tab 3, at p. 5.

At the hearing TFO Williams testified that pursuant to the directive in the statute and in anticipation of Judge Perry's Order, a "minimization meeting" was held on March 3, 2005.  TFO Williams met with all of the officers/agents/detectives who would be monitoring the wiretap.  The monitors were provided copies of the Application, TFO Williams's Affidavit in Support of the Application and the Order to be signed by Judge Perry.  TFO Williams reviewed with them the letter entitled Guidelines for the Conduct of Electronic Surveillance of Land Line Telephone (573) 518-1819.  Tab 4.  Each monitoring agent was required to read the Guidelines, the Application, the Affidavit and the Order.  In order to indicate that he/she had read the Guidelines, there was a final page on which each monitoring agent stated his/her name, title and the date he/she read the document and understood it.  See the Certification signed by each of the monitoring agents on the last page of another copy of the Guidelines inserted in the pocket of the binder and introduced as Gov.Ex.2.  The names are printed on the side to make sure the signatures could be read.  The Affidavit, Order and Guidelines were maintained in the monitoring room by the monitoring stations.  The Guidelines discuss all aspects of the wiretap including the recording of any monitored interception and the preparation of a written memorandum contemporaneous with the overhearing of a conversation.  Detailed minimization requirements were thoroughly explained in writing and orally at the meeting and the agents had an opportunity to ask questions.

The Guidelines discuss spot monitoring for a reasonable period of time not to exceed two minutes to determine whether any of the target subjects were present and participating in a conversation.  If a target was engaged in a conversation, the interception could continue for a

reasonable time usually not in excess of two minutes to determine whether the conversation concerned criminal activities. The spot monitoring could occur as often as reasonable but in any event at least one minute should elapse between interceptions. If, during the spot monitoring it was determined that different or additional individuals were engaged in criminal conversation, the monitoring could continue despite the fact that a named subject was not engaged in the conversation until the conversation ended or became non-pertinent. The Guidelines discuss what to do if a conversation <u>may</u> relate to drug crimes or other crimes and how to handle conversations that experience shows are always innocent or always criminal.

The totality of TFO Williams testimony shows that every effort was made to fulfill the minimization requirements in the most professional manner possible. To the extent some of the pertinent conversation contained some sort of "code" for narcotics trafficking, the agents, who were experienced in the use of such jargon, attempted through initial spot monitoring to decipher the code and the various monitors compared notes to come to a consensus about the meaning of the code words.

Whether the government complied with the requirements of § 2518(5) is determined by an objective, reasonableness standard. <u>United States v. Williams</u>, 109 F.3d 502, 507 (8th Cir. 1997) <u>citing</u> <u>Scott v. United States</u>, 436 U.S. 128, 137-38 (1978). Factors to be considered include the scope of the enterprise [here it was extensive], the agents' reasonable expectation of the contents of the calls [they were all fully briefed on what to expect], the extent of judicial supervision [the government provided regular ten day reports to the Judge], length and origin of a call [thorough logs were kept] and the use of coded or ambiguous language. <u>Williams</u>, 109 F.3d at 507. More extensive wiretapping is reasonable when "the conversations are in the jargon of the drug trade." <u>Id.</u> at 507 <u>quoting</u> <u>United States v. Macklin</u>, 902 F.2d 1320, 1328 (8th Cir. 1990), <u>cert. denied</u>, 498 U.S. 1031 (1991).

The undersigned finds no violation of the statute or Judge Perry's Order and notes that "a party challenging the validity of a federal wiretap order must show a substantial, not just technical, deviation from the requirements of the statute." <u>United States v. Fairchild</u>, 187 F.3d 769 (8th Cir.

1999).  In the present case, no deviation has been shown either by way of cross examination at the hearings or in the memoranda in support of motions to suppress by the defendants.

2.      **Ten Day Reports**

18 U.S.C. § 2518(6) states:

> Whenever an order authorizing interception is entered pursuant to this chapter, the order may require reports to be made to the judge who issued the order showing what progress has been made toward the authorized objective and the need for continued interception.  Such report shall be made at such intervals as the judge may require.

18 U.S.C. § 2518(6).

Here, the government provided a report every 10 days for the target telephone.  Tabs 5, 6 and 7  contain the 10 day reports.  Each report is signed by an Assistant United States Attorney.   Each of the 10 day reports is signed by a United States District Judge.  Generally, the reports state for each day covered by the report the total number of calls intercepted, of those the number that were pertinent, the number of calls that were privileged and the number of calls that were minimized.  The reports state,  of the intercepted calls, the number that were completed and the number that were longer than two minutes in duration.  The reports then go on to summarize the calls intercepted for each day covered by the report.  The requirement for such periodic reports is discretionary on the part of the judge and here, there was no violation of the reporting provisions of Judge Perry's Order or the statute.

3.      <u>Sealing</u>

18 U.S.C. § 2518(8)(b) provides that all applications made and orders granted under Title III shall be sealed by the judge.  All documents in this case were clearly marked "Filed Under Seal" and kept in the Clerk's Office of the United States District Court in the Eastern District of Missouri in a place designated for such sealed documents.  No such documents were disclosed to any person except upon authorization by the court following the indictment of the named target and/or pursuant to 18 U.S.C. § 2517.  There was no violation of the document sealing provisions of 18 U.S.C. § 2518(8)(b).

18 U.S.C. § 2518(8)(a) provides that the contents of any wire, oral or electronic communication intercepted shall be recorded by tape or wire or other comparable device. Here, all intercepted calls from the target phone were recorded on Magneto Optical disks. The statute requires that the recordings be done in such a way to protect the recording from editing or other alterations. See Tab 4, Guidelines for Monitoring Electronic Surveillance, in which this requirement is spelled out in detail at ¶5. TFO Williams testified at length about the maintenance of the Magneto Optical disks in a room separate from the room in which the monitoring of the calls was conducted. TFO Williams testified that the recordings themselves could not be and were not altered.

18 U.S.C. § 2518(8)(a) also provides that immediately upon expiration of the Order or extensions thereof, the recordings shall be available to the judge issuing the Orders and sealed. TFO Williams testified that at the conclusion of the interception period, that is between 3/7/05 and 4/5/05, he obtained the Magneto Optical disk for that period and after appropriately packaging, initialing and dating it, presented it to Judge E. Richard Webber with a sealing application. Tab 8. Judge Webber signed an Order sealing the disk and ordered that it be held in the custody of the Drug Enforcement Administration for a period of ten years from the date of the Order in a manner so as to prevent tampering, alteration and/or destruction. Tab 9.

TFO Williams testified that the Magneto Optical disk was placed in an evidence envelope. He signed the envelope as did the Judge. The sealing requirements were fully observed and there was no violation of the statute.

E.      Conclusion

Having considered the meticulous documentation provided by the government, the testimony of TFO Williams, the extensive cross examination of counsel for defendants, the memoranda in support of the defendants' motions to suppress and having analyzed the law in connection with all the available facts, the undersigned finds that the communications intercepted on the wiretap of land

line number 573-518-1819 should not be suppressed. All statutory requirements were met or exceeded.

Accordingly,

IT IS HEREBY RECOMMENDED that Paul Kinney's Motion to Suppress Interception of Electronic Communications be DENIED. [Doc. 33]

IT IS FURTHER RECOMMENDED that Ronald Kinney, Jr.'s Motion to Suppress the Contents of Any Electronic Surveillance be DENIED. [Doc. 31]

IT IS FURTHER RECOMMENDED that Michael Smith's Motion to Suppress the Contents of Any Electronic Surveillance be DENIED. [Doc. 161]

IT IS FURTHER RECOMMENDED that Barbara Johnson's Motion to Suppress the Contents of Any Electronic Surveillance be DENIED. [Doc. 167]


The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).


/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE


Dated this  3rd   day of November, 2005.

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. SI4:05CR280ERW(MLM) |
| | ) | |
| PAUL KINNEY, RONALD KINNEY, JR., | ) | |
| MICHAEL SMITH and BARBARA JOHNSON, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE CONCERNING
## ELECTRONIC SURVEILLANCE BY MEANS OF A WIRETAP

This Report and Recommendation deals only with motions filed by the four above-named defendants in this eleven defendant case to suppress contents of electronic surveillance by means of a Title III wiretap.[1] Pretrial matters were referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b). This case is set for trial before the Honorable E. Richard Webber on December 12, 2005.

Because of the number of defendants who originally filed motions concerning electronic surveillance by wiretaps, two Evidentiary Hearings were scheduled. The first, on September 16, 2005, was a full hearing at which the government's exhibits and documents were properly admitted and testimony was elicited followed by cross examination. At this hearing, counsel for defendants Ronald Kinney, Jr. and Christina Smith participated. The court made it clear that defense counsel were not to repeat objections and questions and that an objection or question by one applied to all. The court further noted, as it had in previous orders, that the defendants who had not waived hearing on Title III wiretap issues would be provided an expedited transcript of the 9/16/05 hearing

---

[1] All other pending pretrial motions will be dealt with in separate R&Rs.
It is to be noted that numerous defendants withdrew on the record their previously filed pretrial motions or have given notice on the record that they did not intend to file pretrial motions: Carolyn Mayberry [173, waiver]; Christina Smith [163, 164, 165, withdrawn]; Elizabeth Williams [169, 170, 171, withdrawn]; Michelle Reinhert [176, withdrawn]; Barbara Johnson [168, only, withdrawn], John Radford [166, waiver]; Anna Foust [172, waiver].

as well as all of the government's evidence and documents, and if any defendant had further relevant non-repetitive questions, the court would make the witnesses available for cross examination at a hearing on September 29, 2005.  On September 29, 2005, having reviewed the expedited transcript and all the evidence and documents, no further cross examination by any of the remaining defendants was requested.

## INDEX

I.    **Electronic Surveillance by Means of Title III Wiretap: 573-518-1819** . . . . . . 3

    A.    **Authorization and Application** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.    **Affidavit** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        1.    **Probable Cause** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        2.    **Previous Applications** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        3.    **Other Investigative Procedures** . . . . . . . . . . . . . . . . . . . . . . . . 19

    C.    **Court Order and Order to Service Provider** . . . . . . . . . . . . . . . . . . . . . 22

    D.    **Post Authorization Duties** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        1.    **Minimization** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        2.    **Ten Day Reports** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        3.    **Sealing** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    E.    **Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

# I.    Electronic Surveillance by Means of Title III Wiretap: 573-518-1813

The government's documentary evidence is contained in a large binder.  Gov.Ex.1.  Each document is numbered and tabbed.  The court incorporates by reference as if fully set out herein the entire volume of documents in the binder as well as  Gov.Ex.2 in the pocket of the binder.  The government properly admitted all of the documents and exhibits into evidence.   At the hearing the government presented the testimony of Gerald Williams, a detective in the Jefferson County Sheriff's Department.  Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witness, the undersigned makes the following findings of fact and conclusions of law with regard to the wiretap.

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 codified at 18 U.S.C. § 2501, *et seq.*, which provides for the interception of wire, oral or electronic communications, specifically permits an "aggrieved person" to move to suppress the contents of such interceptions on grounds that:

(i)     the communication was unlawfully intercepted;

(ii)    the order of authorization or approval under which it was intercepted is insufficient on its face;

(iii)   the interception was not made in conformity with the order of authorization or approval.

18 U.S.C. § 2518(10)(a).  This section also provides that upon filing such a motion, such portions of the intercepted communications or evidence derived therefrom shall, as the judge determines to be in the interests of justice, be made available to the aggrieved person.  As an initial matter, in the present case, the government has made available to counsel for defendant all the documentary evidence as well as all of the intercepted communications.  The court finds that this portion of the statute has been meticulously observed by the government.

Title III sets forth a comprehensive legislative scheme regulating the interception of oral and wire communications.  "This legislation attempts to strike a delicate balance between the need to protect citizens from unwarranted electronic surveillance and the preservation of law enforcement

tools needed to fight organized crime." <u>United States v. Phillips</u>, 540 F.2d 319, 324 (8th Cir. 1976). The statute provides for the interception of wire, oral and electronic communications only under certain circumstances and only if specific procedures are followed. The undersigned will take up in order the procedures required by the statute.

A.      **Authorization and Application**

18 U.S.C. § 2516 provides that the Attorney General of the United States may specially designate the Assistant Attorney General, any Acting Assistant Attorney General, any Deputy Assistant Attorney General or any Acting Deputy Assistant Attorney General of the Criminal Division to exercise the power conferred on the Attorney General by 18 U.S.C. § 2516 to authorize an application to a federal district judge for an order authorizing the interception of wire, oral and electronic communications. The government introduced and attached to its Application copies of the Attorney General's Order of Special Designation, Order No. 2758-2005, dated February 24, 2005, and the letter of Authorization for Interception Order Application, dated March 4, 2005. (Tab 1, Attachments). An authorization for such an application is presumed to be valid unless the person challenging the application makes a prima facia showing that it was not so authorized. <u>See United States v. O'Connell</u>, 841 F.2d 1408, 1416 (8th Cir. 1988), <u>cert.denied</u>, 488 U.S. 1011 (1989). In this case, the defendants did not challenge the authorization and the court finds that all requirements of 18 U.S.C. § 2516 regarding the authorization were fully observed.

The application for a wiretap must include the identity of the law enforcement officer making the application, the person authorizing the application, a full and complete description of the facts relied on, including details of the alleged offense; a description of the facilities where the communications are to be intercepted; a description of the communication sought to be intercepted; the identity of the persons whose communications will be intercepted; whether other investigative procedures have been tried; and the period of time for which the interception is requested. The application must also indicate whether previous applications involving the same facilities, persons

or places have been made.  18 U.S.C. § 2518(1).  The application may include additional evidence in support.  18 U.S.C. § 2518(2).

Here the Application (Tab 1) contained all of the statutorily required elements: it contained the identity of the law enforcement officer making the application, an authorization from an Assistant Attorney General designated to make such authorization, and included the items regarding the persons, places and communications sought to be intercepted.  It also indicated that it sought to intercept communications for no more than thirty days and described all previous applications, of which there were none.  There was no error in the form of the Application.  Pursuant to 18 U.S.C. § 2518(2), the Application was supported by an Affidavit. (Tab 2).  This Affidavit expanded and described in detail the information contained in the Application including a full and complete statement of the facts and circumstances relied upon by the applicant to justify the belief that an order should be issued including:

> (i) details as to the particular offense that has been, is being, or is about to be committed, (ii) except as provided in subsection (11) a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (iii) a particular description of the type of communication sought to be intercepted, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted.

18 U.S.C. § 2518(b).  The Application complies fully with the statute.


B.      **Affidavit**

As noted above, the court incorporates by reference as if fully set out herein the Affidavit submitted by Gerald Williams.[2]  However, a general summary may prove helpful.  This summary does not include all of the information in the Affidavit but is intended merely to assist the court. The entire Affidavit as submitted in Tab 2 is the basis of the probable cause.  The Affidavit

---

[2]      Gerald Williams has been a detective in the Jefferson County Sheriffs Department for five and one-half years.   For approximately the past year he has been detached to the Drug Enforcement Administration ("DEA").  He has received training in the identification of controlled substances and the methods of operations of drug traffickers.

submitted by Task Force Officer ("TFO") Williams states that he is an investigative and law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7) and is empowered by law to conduct investigations of and make arrests for offenses enumerated in 18 U.S.C. § 2516. The Affidavit states there is probable cause to believe that certain "target subjects", Paul Kinney, Carolyn Annette Mayberry, Christina Smith, Jason Wisdom, Tamara Montgomery, Michael Smith, Ronald Kinney, Jr., Bruce Marler, Ronda Long, Charles Bieser, Randall Woods, Alfredo Vallarino, Saundra Sherffius, and Michelle Reinhert and others yet unknown, were committing and conspiring to commit violations involving possession with intent to distribute and distribution of methamphetamine, the unlawful use of a communications facility to facilitate distribution of a controlled substance, a continuing criminal enterprise, interstate travel to facilitate a narcotics business and money laundering.

The Affidavit states that the target hard line telephone, 573-518-1819 (the "target telephone") was subscribed to Jason Wisdom and utilized by Carolyn Mayberry. The authorization requested was intended to apply not only to the target telephone but to any changed telephone number subsequently assigned to the same cable, pair, and binding post utilized by the target land line telephone within a thirty (30) day period. The Affidavit further states that the requested authorization be intended to apply to background conversations intercepted in the vicinity of the target residential telephone while the target telephone was "off-hook" or otherwise in use.

The Affidavit further states that there is probable cause to believe that particular wire and electronic communications of the target subjects and others yet unknown, concerning the above-named offenses, would be obtained through the interception of wire communications to and from the target telephone. In particular, these communications were expected to concern the specifics of the above-named offenses, including (1) the nature, extent and methods of operation of the drug distribution of the target subjects, and others yet unknown; (2) the identities and roles of accomplices, aiders and abetters, co-conspirators and participants in their illegal activity; (3) the distribution and transfer of the contraband and money involved in those activities; (4) the existence

and location of records pertaining to those activities; (5) the location and source of resources used to finance their illegal activities; (6) the location and disposition of the proceeds from those activities; and (7) the locations of items used in furtherance of those activities. In addition, the communications were expected to constitute admissible evidence of the commission of the above-described offenses.

The Affidavit gives the pedigree and arrest record of each of the named subjects, most of which are quite extensive.

The Affidavit indicates that based on record checks of the Drug Enforcement Administration, the Federal Bureau of Investigation and the Bureau of Immigration and Customs Enforcement completed on March 2, 2005, there was no application for an order authorizing the interception of the wire, oral, or electronic communications involving the target telephone or the target subjects.

The Affidavit summarizes the background of the investigation. Since January, 2002 DEA, the State of California Department of Justice, Bureau of Narcotic Enforcement, ("BNE") and the Park Hills, Missouri Police Department conducted investigations which developed information relating to methamphetamine trafficking of the Paul Kinney organization. A substantial amount of intelligence gathered during these investigations was through the use of such law enforcement activities as surveillance, pen registers, toll analysis, interviews of confidential sources, search warrants and document analysis.

In November, 2004 DEA agents from the St. Louis Division initiated an investigation of the Paul Kinney organization which indicated that the organization was currently distributing multi-pound quantities of methamphetamine throughout St. Francois County, Missouri, Anaheim, California and other locations throughout the United States. The investigation revealed that the organization manufactures methamphetamine in laboratories located in the Anaheim, California area and uses sources of supply for methamphetamine located in California which are affiliated with Mexican criminal gangs.

The Affidavit indicates that the Paul Kinney organization primarily consists of family members of Paul Kinney and close/trusted associates located in Park Hills, Missouri and Anaheim, California. Ronald Kinney, Jr. is the biological brother of Paul Kinney and was identified as a high ranking member, facilitator and methamphetamine manufacturer for the Paul Kinney organization. Carolyn Mayberry, a former paramour of Ronald Kinney, Jr., was identified as the St. Francois County, Missouri regional manager/distributor for the Paul Kinney organization.

The Affidavit summarizes the nature of the investigation and then describes activities and events in great detail. Generally, the organization was known to use violence in relation to its drug trafficking activities. Search warrants and law enforcement contacts led to the seizure of several handguns, assault rifles and shotguns from members of the organization. Several of the target subjects have violent felony criminal records to include weapons violations, threatening witnesses, resisting arrest, burglaries and felony assaults. In January, 2000 Paul Kinney was arrested for the manufacture with intent to distribute methamphetamine (as further detailed in Significant Event #1 of the Affidavit). During this arrest Paul Kinney was found in possession of two assault rifles, an Uzi sub-machine gun and two shotguns. In addition, as related in the Confidential Sources section of the Affidavit, CS #3 was held against his/her will by Carolyn Mayberry and Randy Woods when they believed CS #3 might possibly be cooperating with law enforcement.

The Affidavit indicates that the Paul Kinney organization used Federal Express and United Parcel Service to ship packages of methamphetamine to St. Francois County, Missouri as well as other locations in the United States. Upon arrival in St. Francois County, Missouri methamphetamine was delivered through a network of retail distributors managed by Carolyn Mayberry. In turn, she sent money to Paul Kinney by way of Western Union money orders and postal package shipments for the methamphetamine. This general summary is then particularized.

Confidential Sources were used extensively. Confidential Source #1 ("CS #1") had known brothers Paul Kinney and Ronald Kinney, Jr. for approximately six years. CS #1 was aware of Paul Kinney's residence and had two phone numbers at which he/she could contact him. CS #1 gave

information that Paul Kinney is the leader of a large scale methamphetamine distribution organization operating out of the Anaheim, California area. CS #1 stated that the organization distributes multi-pound quantities of methamphetamine in and about Anaheim and operates multiple methamphetamine laboratories in that area. CS #1 had personally observed the manufacture of methamphetamine by the Paul Kinney organization and had personally obtained quantities of methamphetamine from the organization. CS #1 stated that Ronald Kinney, Jr. is the manager of the methamphetamine laboratories for the organization. The Paul Kinney organization has separate sources of supply for methamphetamine located in Los Angeles which are affiliated with Mexican criminal gangs. At the time of the drafting of the Affidavit, CS #1 was no longer cooperating with the investigative team and was unwilling to provide further information. The information provided by CS #1 was limited in regards to structure, number of members their prospective roles and the scope of the organization.

Confidential Source #2 ("CS #2") provided information from approximately November through the end of December, 2004 about the Paul Kinney organization. The information provided by CS #2 was corroborated by other types of investigative methods and was therefore considered reliable. CS #2 provided information that led to the seizure of drugs, weapons and the arrest of multiple defendants. CS #2 had prior felony drug offenses and was cooperating with the investigative team for possible assistance regarding the offenses. CS #2 was not financially compensated for his/her cooperation. CS #2 gave information obtained during the five years he/she had known Paul Kinney. CS #2 was aware of Paul Kinney's residence address and that it was in an office/industrial park facility. CS #2 indicated that Paul Kinney used 3910 East Coronado, Unit G, in Anaheim as a location to manufacture methamphetamine. The Affidavit notes that on October 16, 2004 Christina Smith sent a Western Union money order in the amount of $900 to Alfredo Vallarino at the Unit G address. This is further detailed in the analysis of Western Union records section of the Affidavit. CS #2 had contact phone numbers for Paul Kinney and a contact cell phone number. CS #2 confirmed the information received from CS #1 about the large scale

methamphetamine distribution organization and indicated that Paul Kinney manufactured multi-pound amounts of methamphetamine in multiple laboratories. CS #2 stated that Paul Kinney had been arrested and served time in a California state prison for the manufacture of methamphetamine. CS #2 was a distributor for the Paul Kinney organization. He/she had purchased pound quantities of methamphetamine from defendant Paul Kinney on multiple occasions over the two years preceding the Affidavit. CS #2 indicated he/she would pay approximately $7,000 - $10,000 for each pound of methamphetamine he/she purchased from Paul Kinney. At the time of the Affidavit, CS #2 was no longer cooperating with the investigative team and was unwilling to provide further information. The information provided by CS #2 was limited in the same manner as the information provided by CS #1.

Confidential Source #3 ("CS #3") provided law enforcement agents with information regarding the Paul Kinney organization since November, 2004. The information was corroborated by other investigative methods and was therefore considered reliable. The information provided by CS #3 led to the seizure of approximately two pounds of methamphetamine from the Paul Kinney organization, further detailed in Significant Event #5 of the Affidavit. CS #3 has a prior felony conviction for a drug offense and cooperated with the investigative team for possible assistance regarding a probation violation. CS #3 was not financially compensated for his/her cooperation. CS #3 stated he/she had known Paul Kinney, Ronald Kinney, Carolyn Mayberry and Christina Smith for approximately five years. CS #3 was aware of the fraternal relationship between Paul Kinney and Ronald Kinney, Jr. and knew that Carolyn Mayberry is the mother of three of Ronald Kinney, Jr.'s children. Carolyn Mayberry and Christina Smith are first cousins. CS #3 was aware of Paul Kinney's residence in Anaheim and had several contact numbers at which he/she could reach him. CS #3 stated that Carolyn Mayberry resides at 217 Houser Street in Park Hills, Missouri with her brother, Jason Wisdom. CS #3 could contact Carolyn Mayberry at the target telephone number, 573-518-1819. CS #3 was aware of the residence of Christina Smith and had a

contact number for her. CS #3 was fully aware of the nature of the large scale methamphetamine distribution organization run by Paul Kinney.

CS #3 indicated that he/she purchased ounce quantities of methamphetamine from Carolyn Mayberry on multiple occasions over the last five years, paying approximately $1600 for each ounce of methamphetamine. CS #3 also lived with Carolyn Mayberry starting in the summer of 2004 until late November, 2004. CS #3 acted as a "lieutenant" for Mayberry and sent money on behalf of Mayberry to Paul Kinney.

CS #3 stated that beginning in approximately September, 2004 Carolyn Mayberry began to receive pound quantities of methamphetamine from Paul Kinney by way of Federal Express and United Parcel Service. CS #3 was present when several of these packages were opened by Carolyn Mayberry. Significant Events #5 and #7 corroborate the information about the methods of packing the methamphetamine in plastic zip lock bags given by CS #3. CS #3 stated that Carolyn Mayberry would call Paul Kinney from the target telephone to arrange the shipments and to confirm the arrival of the packages. CS #3 was present on numerous occasions when Mayberry spoke with Paul Kinney and overheard Mayberry discussing the shipments over the target telephone. All the phone calls involved drug trafficking. CS #3 stated that Carolyn Mayberry paid approximately $600 for each ounce of methamphetamine and that she would then cut the methamphetamine with a powdered vitamin called Methyl-Sulfonyl-Methane (MSN). CS #3 assisted in obtaining the MSN and cutting the methamphetamine at the direction of Mayberry. Carolyn Mayberry would sell each ounce of cut methamphetamine for approximately $1600. Carolyn Mayberry used a portion of her profits to make renovations to her residence.

CS #3 stated that Carolyn Mayberry distributed methamphetamine through a group of retail distributors located in Park Hills, Missouri. CS #3 identified at least ten of Carolyn Mayberry's methamphetamine distributors. CS #3 stated Carolyn Mayberry sent Paul Kinney money for the purchase of the methamphetamine by way of Western Union money orders made out to Paul Kinney, Ronald Kinney, Jr. or Alfredo Vallarino. CS #3 stated that Carolyn Mayberry also directed

other named targets to send money on her behalf to Paul Kinney by way of Western Union money orders for the purchase of methamphetamine. These money orders were all in amounts less than $1000 to avoid suspicion. Larger amounts of money sent to Paul Kinney would be broken down into several smaller money orders. CS #3 stated Carolyn Mayberry would call Paul Kinney on the target telephone to arrange the wire transfers of the money orders and confirm they had been picked up in California. CS #3 stated Mayberry frequently used the target telephone to call Paul Kinney and to receive calls from Paul Kinney on a regular basis.

CS #3 stated that following the seizure of two pounds of methamphetamine in November, 2002, further detailed in Significant Event #4, Carolyn Mayberry believed her house was being watched and that someone was acting as a confidential source for law enforcement. Carolyn Mayberry and Paul Kinney discussed utilizing different methods of transporting methamphetamine and sending money. CS #3 stated Carolyn Mayberry became suspicious of CS #3 following the seizure of the two pounds of methamphetamine and accused CS #3 of being a "snitch" for law enforcement and physically threatened him/her. CS #3 stated Carolyn Mayberry and Randy Woods locked CS #3 in the bedroom in Carolyn Mayberry's residence. CS #3 stated that Carolyn Mayberry told CS #3 that he/she would be held until Carolyn Mayberry could determine whether CS #3 was a "snitch." CS #3 stated that he/she was able to escape from Carolyn Mayberry's residence and has not seen or spoken to her since that time. CS #3 fears for his/her personal safety from Carolyn Mayberry and Randy Woods. CS #3 was incarcerated in December of 2004 and at the time of the Affidavit, remained incarcerated. CS #3 stated he/she is no longer trusted by Mayberry and has not had any contact with her or other members of the organization.

In addition to the use of confidential sources, certain **significant events** contributed to the investigation of the Paul Kinney organization.

Significant Event #1 occurred on February 29, 2000 when officers from the State of California Department of Justice, Bureau of Narcotic Enforcement (BNE) executed a California state search warrant on 3860 Coronado Street, Unit J and 3910 Coronado Street, Unit G after numerous

surveillances, during which BNE officers observed Paul Kinney and Ronald Kinney, Jr. enter and exit both units. The search warrants resulted in the seizure of approximately ten pounds of methamphetamine, three gallons of methamphetamine in solution, two assault rifles, an Uzi sub-machine gun, two shotguns, laboratory equipment and the arrests of six defendants. Paul Kinney was arrested for the methamphetamine and was subsequently prosecuted.

Significant Event #2 took place on August 29, 2004 when Michelle Reinhert placed a recorded telephone call from the St. Francois County Jail to the target telephone number. The call was confirmed by both jail phone records and toll records for the target telephone. Michelle Reinhert asked Carolyn Mayberry to place a "three way" telephone call to Megan LNU. Based on the training and experience of the investigative team, TFO Williams believed that Carolyn Mayberry, Michelle Reinhert and Megan LNU were discussing illegal drugs that were hidden at the residence of Michelle Reinhert. Further, Michelle Reinhert wanted Carolyn Mayberry and Megan LNU to remove the illegal drugs from her residence in order to avoid their discovery by law enforcement.

Significant Event #3 took place on August 31, 2004 when Randy Woods placed a recorded telephone call from the St. Francois County Jail to the target telephone. The call was verified by the jail phone records and the toll records for the target telephone. Based on the training and experience of the investigative team, TFO Williams believed this conversation concerned Randy Woods warning Carolyn Mayberry to be cautious while distributing illegal drugs because he believed some of their customers may be acting as confidential sources for law enforcement.

Significant Event #4 took place on September 18, 2004 when Michelle Reinhert's biological son, Jeff, placed a recorded telephone call from the St. Francois County Jail to the target telephone. The call was confirmed by jail telephone records and the toll records for the target telephone. Based on the training and experience of the investigative team, TFO Williams believed the conversation concerned Michelle Reinhert sending money by way of Western Union money orders to Paul Kinney on behalf of Carolyn Mayberry. On October 6, 2004 and October 8, 2004 Michelle Reinhert sent

Western Union money orders to Paul Kinney as further detailed in the analysis of Western Union documents section of the Affidavit.

Significant Event #5 concerned a two pound package of methamphetamine which was supposed to be shipped from Paul Kinney to Carolyn Mayberry. On November 22, 2004 CS #3 told the investigative team that the next day Paul Kinney would be sending a package by United Parcel Service ("UPS") next day delivery containing methamphetamine to Carolyn Mayberry. The investigative team requested UPS place a "lookout" for such a package. Upon locating the package, a police narcotics canine alerted to the presence of illegal drugs. A Missouri state search warrant was obtained for the intercepted package and upon execution of the warrant the package was found to contain approximately two pounds of methamphetamine which was then seized. Telephone toll records of the target telephone, a cellular telephone utilized by Paul Kinney and a hard line telephone used by Paul Kinney indicate numerous phone calls between Paul Kinney and Carolyn Mayberry. Based on the training and experience of the investigative team, TFO Williams believed that Carolyn Mayberry used the target telephone on November 22nd, 23rd, and 24th to contact Paul Kinney to coordinate the shipment of the two pounds of methamphetamine seized from the UPS package. When the package did not arrive, Carolyn Mayberry used the target telephone to confer with Paul Kinney regarding the location of the package. UPS records including its website noted the shipment was received by Detective Rigel of the Park Hills, Missouri Police Department who was the affiant on the search warrant and seized the package. Shortly thereafter Det. Rigel reported he started receiving phone calls on his home telephone which caller I.D. reflected was from locations in various states including Arizona, California, Florida and North Carolina. In each instance the caller would hang up. These called increased until the officer was receiving a dozen such calls each day. He had not received these types of calls before the seizure and was therefore relocated for a period of time for officer's safety.

Significant Event #6 concerned the use of a rental car to transport illegal drugs. In December, 2004 law enforcement agents conducting surveillance observed Paul Kinney operating

a rental car registered to Enterprise Rental Cars and rented by Ronald Kinney, Jr. with Paul Kinney listed as a driver. Enterprise advised the investigators that Ronald Kinney, Jr. was contacted on 12/30/04 and 12/31/04 regarding money he owed for the rental car. Ronald Kinney, Jr. said he would come in to settle the matter and Enterprise advised the investigative team that someone dropped off the rental car on the Enterprise rental lot after hours on December 31st with the keys locked in the car. A narcotics canine conducted a search of the rental car and alerted to the presence of the illegal drugs. However, no drugs were located. Based upon his training and experience TFO Williams was aware that the police narcotic canine alert indicated that illegal drugs had previously been present in the rental car. Ronald Kinney, Jr. had rented this vehicle from November 2, 2004 to December 31, 2004. The rental car had been driven 5,971 miles during this time period. CS #3 stated that following the seizure of the two pound package of methamphetamine from the UPS package during November, as detailed in Significant Event #5, the Paul Kinney organization began to utilize couriers and rental cars to transport methamphetamine. Based on the training and experience of the investigative team, TFO Williams believed that the Paul Kinney organization used the rental car to transport illegal drugs.

Significant Event #7 took place on January 5, 2005. Bruce Marler called the Park Hills, Missouri Police Department and left a message that he wanted Det. Rigel to call him on a hard line telephone subscribed to by his mother. Det. Rigel's home telephone caller identification revealed that that hard line number had contacted his home telephone earlier that date. CS #3 had identified Bruce Marler as a methamphetamine distributor for the Paul Kinney organization. UPS inadvertently listed Det. Rigel's name on their package tracking website as having possession of the two pounds of methamphetamine seized on November 24, 2004. Later on January 5th Det. Rigel placed a recorded telephone call to Bruce Marler. Toll records reveal that shortly thereafter the hard line telephone used by Bruce Marler contacted the target telephone. Based on the training and experience of investigative team, TFO Williams believed that the Paul Kinney organization used the UPS package tracking website to identify Det. Mark Rigel. Further, Bruce Marler, at the direction

of the organization, was attempting to determine if Det. Rigel was conducting a criminal investigation regarding the two pounds of seized methamphetamine from the UPS package sent to Carolyn Mayberry. TFO Williams further believed that Bruce Marler contacted Carolyn Mayberry on the target telephone to report his findings.

Significant Event #8 began on November 23, 2004, the day the two pound methamphetamine package was shipped to Carolyn Mayberry. The shipper also shipped a UPS package to Steve Unruh in Shawnee, Oklahoma. Federal Express placed a lookout on the Shawnee, Oklahoma address and in February, 2005 Federal Express notified the investigative team that it located a package addressed to the vacant building next door to Steve Unruh's residence. A police narcotics canine alerted to the presence of illegal drugs and an Oklahoma state search warrant was executed on the intercepted package. The package contained a plastic zip lock bag containing approximately one pound of methamphetamine. This methamphetamine was hidden within a cardboard box containing a computer cooling fan. CS #3 had previously stated that the UPS and FedEx packages sent to Carolyn Mayberry by Paul Kinney contained methamphetamine stored in plastic zip lock bags hidden within boxes containing computer parts as further detailed in the Confidential Sources section of the Affidavit. Paul Kinney had previously used 3910 Coronado, Unit G to operate a methamphetamine laboratory and on October 16, 2004 Christina Smith sent a Western Union money order in the amount of $900 to Alfredo Vallarino at the East Coronado address which bore a telephone number of a hard line telephone used by Paul Kinney as further detailed in the Analysis of Western Union records section of the Affidavit. On January 14, 2004 pen register records reflect that two calls were placed over the target telephone to the 800 number utilized by UPS customers to check the status of packages. Based on the training and experience of the investigative team, TFO Williams believed that the one pound package of methamphetamine contained in the Federal Express package was shipped by Paul Kinney to Steve Unruh. Further, TFO Williams believed that this shipment demonstrated how the Paul Kinney organization was then

using alternative addresses and false names to ship methamphetamine packages in light of the November 24, 2004 seizure of the package sent to Carolyn Mayberry.

Paragraphs 56-65 of the Affidavit detail an analysis of **Federal Express and United Parcel Service records** between the Paul Kinney organization and Carolyn Mayberry for the year 2004. The records are detailed and significant and are followed with phone calls between Carolyn Mayberry and Paul Kinney to coordinate the shipment of packages. These phone calls are documented in toll records. Based on the training and experience of the investigative team and the information provided by CS #3, TFO Williams believes that these packages were shipments of methamphetamine from the Paul Kinney organization and that Carolyn Mayberry used the target telephone to coordinate the shipment of the packages.

**Western Union records** were also analyzed and paragraphs 66-77 of the Affidavit detail the analysis of these records. CS #3 had previously stated that Carolyn Mayberry utilized Western Union to pay for methamphetamine shipments from the Paul Kinney organization. Western Union records for Carolyn Mayberry and others identified as members of the organization are confirmed in the Western Union money order records. Based on the training and experience of the investigative team and the information received from CS #3, TFO Williams believed that all of the Western Union money orders were for the purchase of methamphetamine from the Paul Kinney organization and that Carolyn Mayberry utilized the target telephone to coordinate the payments. The target telephone was also the subject of **pen register analysis**. On December 31, 2004 United States Magistrate Judge David D. Noce signed an order authorizing the installation of a pen register/trap and trace device on the target telephone for a period of sixty days, based on TFO Williams' belief that the target telephone was being used by Carolyn Mayberry to manage the purchase and distribution of illegal drugs. Paragraphs 78-79, with numerous sub parts, detail the pen register analysis which indicates that during the sixty days authorized by Judge Noce, there were over 1000 calls between the target telephone and the hard line telephones and cell phones used by persons who were targets of the investigation.

Based on the training and experience of the investigative team and all of the facts set forth in the Affidavit, it was TFO Williams' belief that the interception of wire communications was the only investigative technique that had a reasonable likelihood of success by assisting to secure the evidence needed to prove beyond a reasonable doubt that the target subjects and others not yet identified were acting as a part of the Paul Kinney organization and were engaged in the distribution and sale of methamphetamine and the laundering of monetary proceeds.

1.      **Probable Cause**

Under 18 U.S.C. § 2518(3) the court may issue an order authorizing the interception of wire, oral or electronic communications only if it finds probable cause to believe that (1) a person is committing, has committed or is about to commit one of the crimes enumerated in 18 U.S.C. § 2516; (2) communications concerning such crimes will be obtained through the interception; (3) normal investigative procedures have been tried; and (4) the place where the communications are to be intercepted is being used in connection with the commission of such crimes or is being used by a target subject. Even from the general summary set out in the findings of fact above, it clear that the Affidavit provided probable cause that the defendants were conspiring to commit and were committing the violations enumerated above. It is also clear that communications concerning these offenses would be obtained through the interception and that the places where communications were to be intercepted were being used in connection with the offenses.

Courts must test applications for wiretaps and eavesdropping in a "'practical and common sense fashion'". United States v. Garcia, 785 F.2d 214, 221-22 (8th Cir. 1986) quoting United States v. Brick, 502 F.2d 219, 224 n.14 (8th Cir. 1974). See also United States v. Ventresca, 380 U.S. 102, 109 (1965). Those against whom the resulting evidence is admitted have the burden of proving the wiretap was unlawfully obtained or used. Garcia, 785 F.2d at 222; United States v. Phillips, 540 F.2d 319, 385 (8th Cir.), cert. denied, 429 U.S. 1000 (1976). Probable cause for the issuance of a wiretap should be evaluated under the same standard used to evaluate probable cause for the issuance of a search warrant. United States v. Fairchild, 189 F.3d 769, 775 (8th Cir. 1999). "Specifically, probable

cause is present if the totality of the circumstances reveals that there is a fair probability that a wiretap will uncover evidence of a crime." <u>Fairchild</u>, 189 F.3d at 775. In this case, there is no question that the Application and Affidavit contain the fair probability that the wiretap would uncover evidence of a crime.

## 2.    Previous Applications

Pursuant to 18 U.S.C. § 2518(1)(e), the Affidavit fleshes out the Application on the issue of prior applications. It says that the affiant caused a search of computerized data bases of the FBI, DEA and ICE files and that he is not aware of any previous wire, oral or electronic interception applications for the named target or facilities to be intercepted. In the instant case, the Application and Affidavit comply fully with 18 U.S.C. § 2518(1)(e) on the issue of previous applications.

## 3.    Other Investigative Procedures

Pursuant to 18 U.S.C. 2518(1)(c), the Affidavit fleshes out the Application on the issue of "whether or not other investigative procedures have been tried and failed or why they reasonably appear unlikely to succeed if tried or to be too dangerous." <u>Id</u>. The wiretap should be necessary and reasonable, however, "... investigators need not exhaust specific or all possible investigative techniques before a court can issue a wiretap order." <u>United States v. Jones</u>, 801 F.2d 304-314 (8th Cir. 1986). <u>See</u> <u>also</u> <u>United States v. Macklin</u>, 920 F.2d 1320, 1326-27 (8th Cir. 1990), <u>cert.denied</u>, 489 U.S. 1031 (1991); <u>United States v. Smith</u>, 909 F.2d 1164, 1166 (8th Cir. 1990), <u>cert. denied</u>, 498 U.S. 1032 (1991).

> [The Eighth Circuit] held in <u>United States v. Daly</u>, 535 F.2d 434, 438 (8th Cir. 1976) that the necessity requirement of Section 2518 was meant to insure that wiretaps are not routinely employed as the initial step in an investigation. Thus while the statute does require that normal investigative procedures be used first, it does not require that law enforcement officers exhaust all possible techniques before applying for a wiretap. [<u>United States v.</u>] <u>Leisure</u>, 844 F.2d [1347,] 1356 [(8th Cir.), <u>cert. denied</u>, 488 U.S. 932 (1988)]; <u>United States v. O'Connell</u>, 841 F.2d 1408, 1415 (8th Cir.), <u>cert.denied</u>, 487 U.S. 1210 (1998)...the government is simply not required to use a wiretap only as a last resort. <u>United States v. Matya</u>, 541 F.2d 741, 745 (8th Cir. 1976), <u>cert.denied</u>, 429 U.S. 1091 (1977).

<u>United States v. Macklin</u>, 902 F.2d 1320, 1326 (8th Cir. 1990), <u>cert.denied</u>, 489 U.S. 1031 (1991).  In the Affidavit, the government describes in detail the other investigative techniques employed.  See Affidavit, Tab 2 at p. 58-77.  Interviews of subjects or associates were considered.  However, it was believed by all of the investigators involved that interviews would not be successful regarding the drug trafficking activities addressed in the Affidavit because most of the subjects of the investigation live in the small community of Park Hills, Missouri where most of the residents know each other.  In addition, attempts to interview Paul Kinney and Ronald Kinney, Jr. were unsuccessful.

In addition, interviewing members of the conspiracy would alert them to the existence of the investigation causing them to become more cautious in their activities, to flee to avoid further investigation or prosecution, to threaten the lives of cooperating co-conspirators or to otherwise compromise the investigation.

Although pen registers and telephone toll records identified several individuals involved in the defendant's organization, their position in the organization was not known.  Without knowing what position a subject held in the organization, it was impossible to determine which members of the organization would be able to provide further information by way of interview, providing the person would be willing to talk to investigators at all.  Pen registers could not provide evidence of criminal activity.

Mobil tracking devices were considered but the Paul Kinney organization used multiple vehicles and rental vehicles making it impossible to pick one vehicle to install a GPS.  In addition such devices only provide limited information.

In addition, the investigators did not believe that the use of Grand Jury subpoenas for testimony from witnesses would be useful in the early stages of the investigation.  Administrative and Grand Jury subpoenas were, however, utilized to obtain telephone records and financial records.  The records provided valuable but limited information.  Based on the Affiant's experience and that of the Assistant United States Attorney, the Affiant believed that subpoenaing persons believed to be involved in the conspiracy and their associates before a Federal Grand Jury would not be

successful in achieving the stated goals of the investigation. First, they would most likely be uncooperative and invoke their Fifth Amendment privilege not to testify. It would be unwise to offer any kind of immunity for these persons because without more knowledge of the structure and composition of the method of operation for the organization, the granting of such immunity might foreclose prosecution of the most culpable members and could not insure that such immunized witnesses would provide truthful testimony. In addition, the service of Grand Jury subpoenas upon principals of the conspiracy would only alert them to existence of the investigation, causing them to become more cautious, to flee to avoid further investigation or prosecution, to threaten the lives of the informants or otherwise compromise the investigation.

Confidential sources were utilized with limited success. None of the CS's utilized could fully penetrate the organization. The small community of Park Hills posed a problem for infiltration of an organization comprised of family members and long-time acquaintances. The CS's used were not in a position to know the full structure of the organization, to explain the roles of the members of the organization or to identify all sources of supply. CS#1 and #2 were no longer cooperating and CS #3 was incarcerated. The use of the CS's could not accomplish the goals of the investigation.

Undercover agents could not infiltrate the conspiracy at a high enough level to identify the members of the conspiracy or otherwise satisfy the goals of the investigation.

Search warrants, based on the Affiant's experience, would not in all likelihood lead to a considerable quantity of narcotics, money other evidence nor would the searches be likely to reveal the total scope of the illegal operation and the identities of the co-conspirators. Additionally, search warrants would alert the subjects to the existence of the investigation. Some search warrants were used and recovered significant amounts of methamphetamine and allowed for the limited prosecution of Paul Kinney but did not provide the full scope of the organization, or provide knowledge of the location of all the manufacturing and storage facilities. The Title III wiretap would assist the investigative team in maximizing the further use of search warrants.

Police records were used to review past criminal histories but were only of limited value. They could not provide evidence of current criminal activity.

Based on the foregoing, it was the Affiant's belief that the interception of wire communications over target telephone 573-518-1819 was an essential investigative means in obtaining evidence of the offenses in which the subject and others yet unknown were involved. The investigative means, until the date of the application, including the undercover buys and surveillances, were not sufficient evidence of the scope of defendant's drug trafficking organization, the identity and roles of all the members of the organization or the identity of all sources of supply. The Affiant believed that this evidence could only be obtained by the interception of wire communications over the target cellular telephone.

In this case, the Affidavit explains why some procedures would likely fail in this case. The statute does not require more. <u>Macklin</u>, 102 F.2d at 1327. Some of the investigative techniques, while initially successful, failed to reveal the full scope of the conspiracy or present sufficient evidence against known participants. <u>United States v. O'Connell</u>, 841 F.2d 1408, 1415 (8th Cir. 1988), <u>cert.denied</u>, 488 U.S. 1011 (1998) (wiretap necessary even though much evidence had been collected prior to wiretap authorization; information revealed far-flung conspiracy which presented more difficult investigative problems.) In the present case, the Affidavit sets out precisely what was tried, how successful it was and what was not tried and why not. The necessity for a wiretap was fully demonstrated. <u>United States v. Shaw</u>, 94 F.3d 438, 441 (8th Cir. 1996), <u>cert.denied</u>, 514 U.S. 1100 (1997).

## C.    Court Order and Order to Service Provider

If a judge finds probable cause as set out above and also finds that other investigative techniques have been tried and failed or are unlikely to succeed if tried or were too dangerous, he may issue an order authorizing the interception of wire, oral or electronic communications. Under 18 U.S.C. § 2518(4), the order must specify the identity of the persons whose communications are to be intercepted, the nature and location of the communication facilities where the intercept is

granted, the type of communications to be intercepted, the identity of the agency and the person performing the interception in the period of time during which the interception is authorized. The period of time may not be longer than thirty days unless an extension is granted. 18 U.S.C. § 3518(5).

In the present case, the Order signed by the Honorable Catherine D. Perry on March 7, 2005 (Tab 3) complies in all respects with the statute. She found probable cause that the named targets and others then unknown had committed, were committing and would continue to commit offenses involving methamphetamine possession and distribution as well as crimes related to these offenses. She also found probable cause that communications concerning those offenses would be obtained through the interceptions and specifically named the target telephone number. She also found normal investigative procedures had been tried and failed, reasonably appeared to be unlikely to succeed or were too dangerous. The Order provided for a thirty day period of interception and further ordered that the authority (as requested in the application) applied not only to the target cellular telephone but to any changed telephone numbers or any other telephone numbers subsequently assigned to the same electronic serial number (ESN) as the target cellular telephone within the thirty day period. The Order included any background conversations intercepted in the vicinity of the target phone while the phone was off the hook. The monitoring officers were also directed that the interception be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this statute. The Order complies in all respects with the statute.

E.      **Post-Authorization Duties**

Title III imposes certain post-authorization duties which include conducting the interceptions in such a way as to minimize the interception, providing periodic reports to the court, sealing the documents and recordings and sending an inventory/notice to those whose conversations were intercepted.

1.      **Minimization**

18 U.S.C. § 2518(5) provides:

> Every order and extension thereof shall contain a provision that the authorization to intercept...shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter... . In the event the intercepted communication is in a code or foreign language and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

Judge Perry's Order authorizing the wiretap contained such a minimization requirement. Tab 3, at p. 5.

At the hearing TFO Williams testified that pursuant to the directive in the statute and in anticipation of Judge Perry's Order, a "minimization meeting" was held on March 3, 2005. TFO Williams met with all of the officers/agents/detectives who would be monitoring the wiretap. The monitors were provided copies of the Application, TFO Williams's Affidavit in Support of the Application and the Order to be signed by Judge Perry. TFO Williams reviewed with them the letter entitled Guidelines for the Conduct of Electronic Surveillance of Land Line Telephone (573) 518-1819. Tab 4. Each monitoring agent was required to read the Guidelines, the Application, the Affidavit and the Order. In order to indicate that he/she had read the Guidelines, there was a final page on which each monitoring agent stated his/her name, title and the date he/she read the document and understood it. See the Certification signed by each of the monitoring agents on the last page of another copy of the Guidelines inserted in the pocket of the binder and introduced as Gov.Ex.2. The names are printed on the side to make sure the signatures could be read. The Affidavit, Order and Guidelines were maintained in the monitoring room by the monitoring stations. The Guidelines discuss all aspects of the wiretap including the recording of any monitored interception and the preparation of a written memorandum contemporaneous with the overhearing of a conversation. Detailed minimization requirements were thoroughly explained in writing and orally at the meeting and the agents had an opportunity to ask questions.

The Guidelines discuss spot monitoring for a reasonable period of time not to exceed two minutes to determine whether any of the target subjects were present and participating in a conversation. If a target was engaged in a conversation, the interception could continue for a

reasonable time usually not in excess of two minutes to determine whether the conversation concerned criminal activities. The spot monitoring could occur as often as reasonable but in any event at least one minute should elapse between interceptions. If, during the spot monitoring it was determined that different or additional individuals were engaged in criminal conversation, the monitoring could continue despite the fact that a named subject was not engaged in the conversation until the conversation ended or became non-pertinent. The Guidelines discuss what to do if a conversation <u>may</u> relate to drug crimes or other crimes and how to handle conversations that experience shows are always innocent or always criminal.

The totality of TFO Williams testimony shows that every effort was made to fulfill the minimization requirements in the most professional manner possible. To the extent some of the pertinent conversation contained some sort of "code" for narcotics trafficking, the agents, who were experienced in the use of such jargon, attempted through initial spot monitoring to decipher the code and the various monitors compared notes to come to a consensus about the meaning of the code words.

Whether the government complied with the requirements of § 2518(5) is determined by an objective, reasonableness standard. <u>United States v. Williams</u>, 109 F.3d 502, 507 (8th Cir. 1997) <u>citing</u> <u>Scott v. United States</u>, 436 U.S. 128, 137-38 (1978). Factors to be considered include the scope of the enterprise [here it was extensive], the agents' reasonable expectation of the contents of the calls [they were all fully briefed on what to expect], the extent of judicial supervision [the government provided regular ten day reports to the Judge], length and origin of a call [thorough logs were kept] and the use of coded or ambiguous language. <u>Williams</u>, 109 F.3d at 507. More extensive wiretapping is reasonable when "the conversations are in the jargon of the drug trade." <u>Id.</u> at 507 <u>quoting</u> <u>United States v. Macklin</u>, 902 F.2d 1320, 1328 (8th Cir. 1990), <u>cert.denied</u>, 498 U.S. 1031 (1991).

The undersigned finds no violation of the statute or Judge Perry's Order and notes that "a party challenging the validity of a federal wiretap order must show a substantial, not just technical, deviation from the requirements of the statute." <u>United States v. Fairchild</u>, 187 F.3d 769 (8th Cir.

1999).  In the present case, no deviation has been shown either by way of cross examination at the hearings or in the memoranda in support of motions to suppress by the defendants.

2.      **Ten Day Reports**

18 U.S.C. § 2518(6) states:

Whenever an order authorizing interception is entered pursuant to this chapter, the order may require reports to be made to the judge who issued the order showing what progress has been made toward the authorized objective and the need for continued interception.  Such report shall be made at such intervals as the judge may require.

18 U.S.C. § 2518(6).

Here, the government provided a report every 10 days for the target telephone.  Tabs 5, 6 and 7  contain the 10 day reports.  Each report is signed by an Assistant United States Attorney.   Each of the 10 day reports is signed by a United States District Judge.  Generally, the reports state for each day covered by the report the total number of calls intercepted, of those the number that were pertinent, the number of calls that were privileged and the number of calls that were minimized.  The reports state,  of the intercepted calls, the number that were completed and the number that were longer than two minutes in duration.  The reports then go on to summarize the calls intercepted for each day covered by the report.  The requirement for such periodic reports is discretionary on the part of the judge and here, there was no violation of the reporting provisions of Judge Perry's Order or the statute.

3.      <u>Sealing</u>

18 U.S.C. § 2518(8)(b) provides that all applications made and orders granted under Title III shall be sealed by the judge.  All documents in this case were clearly marked "Filed Under Seal" and kept in the Clerk's Office of the United States District Court in the Eastern District of Missouri in a place designated for such sealed documents.  No such documents were disclosed to any person except upon authorization by the court following the indictment of the named target and/or pursuant to 18 U.S.C. § 2517.  There was no violation of the document sealing provisions of 18 U.S.C. § 2518(8)(b).

18 U.S.C. § 2518(8)(a) provides that the contents of any wire, oral or electronic communication intercepted shall be recorded by tape or wire or other comparable device. Here, all intercepted calls from the target phone were recorded on Magneto Optical disks. The statute requires that the recordings be done in such a way to protect the recording from editing or other alterations. See Tab 4, Guidelines for Monitoring Electronic Surveillance, in which this requirement is spelled out in detail at ¶5. TFO Williams testified at length about the maintenance of the Magneto Optical disks in a room separate from the room in which the monitoring of the calls was conducted. TFO Williams testified that the recordings themselves could not be and were not altered.

18 U.S.C. § 2518(8)(a) also provides that immediately upon expiration of the Order or extensions thereof, the recordings shall be available to the judge issuing the Orders and sealed. TFO Williams testified that at the conclusion of the interception period, that is between 3/7/05 and 4/5/05, he obtained the Magneto Optical disk for that period and after appropriately packaging, initialing and dating it, presented it to Judge E. Richard Webber with a sealing application. Tab 8. Judge Webber signed an Order sealing the disk and ordered that it be held in the custody of the Drug Enforcement Administration for a period of ten years from the date of the Order in a manner so as to prevent tampering, alteration and/or destruction. Tab 9.

TFO Williams testified that the Magneto Optical disk was placed in an evidence envelope. He signed the envelope as did the Judge. The sealing requirements were fully observed and there was no violation of the statute.

E.    Conclusion

Having considered the meticulous documentation provided by the government, the testimony of TFO Williams, the extensive cross examination of counsel for defendants, the memoranda in support of the defendants' motions to suppress and having analyzed the law in connection with all the available facts, the undersigned finds that the communications intercepted on the wiretap of land

line number 573-518-1819 should not be suppressed.  All statutory requirements were met or exceeded.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Paul Kinney's Motion to Suppress Interception of Electronic Communications be **DENIED.** [Doc. 33]

**IT IS FURTHER RECOMMENDED** that Ronald Kinney, Jr.'s Motion to Suppress the Contents of Any Electronic Surveillance be **DENIED.** [Doc. 31]

**IT IS FURTHER RECOMMENDED** that Michael Smith's Motion to Suppress the Contents of Any Electronic Surveillance be **DENIED.** [Doc. 161]

**IT IS FURTHER RECOMMENDED** that Barbara Johnson's Motion to Suppress the Contents of Any Electronic Surveillance be **DENIED.** [Doc. 167]


The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).


/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE


Dated this  3rd  day of  November, 2005.